# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

v.

STEVEN JONES, dob xx/xx/1968
GETHARIA M. SMITH, dob xx/xx/1970
OLIVER JONES, dob xx/xx/1967
DEVON CHASE COLE, dob xx/xx/1982
CHALUNDA SMITH, dob xx/xx/1974
TIFFANY M. MARTINEZ, dob xx/xx/1982
JESSICA TALSKY, dob xx/xx/1990
NICOLE TALSKY, dob xx/xx/1992
DEAN ROUSE, dob xx/xx/1956
WILLIAM BANKSTON, dob xx/xx/1974
JOSE DURAN, dob xx/xx/1981

## CRIMINAL COMPLAINT

CASE NUMBER: 12-m-541

I, Michael J. Kurowski, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning sometime in 2010, and continuing through until the present time, in the City of Milwaukee, and in the State and Eastern District of Wisconsin, the above-named individuals did knowingly and intentionally conspire to possess with the intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, §§ 846, 841(a)(1).

I further state that I am a Special Federal Officer assigned to the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the attached affidavit.

Continued on the attached sheet and made a part hereof: ✔ Yes

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 28th, 2012                    at    Milwaukee, Wisconsin
Date                                       City and State

_____
Signature of Judicial Officer

William E. Callahan, Jr., U.S. Magistrate Judge
Name & Title of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Michael J. Kurowski, being duly sworn, depose and state as follows:

## I.    TRAINING AND EXPERIENCE

1.      I am a Detective with the Milwaukee Police Department's Narcotics Division and currently assigned to the Milwaukee HIDTA Drug Task Force. I have worked as a full-time law enforcement officer for over 22 years with the Milwaukee Police Department.  I have been a detective for over 17 years.  I am a Special Federal Officer with the United Stated Department of Justice, Federal Bureau of Investigation (FBI), and have been so since February 23, 2012. During my career in law enforcement, I have investigated violations of federal narcotics laws and related violations, including federal firearms and money laundering offenses. I have had formal training and have participated in numerous complex drug trafficking investigations, including several investigations using wiretaps. Based upon my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

    a.  People involved in large scale narcotics trafficking and/or money laundering routinely maintain records of their transactions.  Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Narcotics traffickers and money launderers typically keep documents demonstrating the purchase of assets, bank records, and other evidence of the accumulation of wealth through their illegal activities, as well as the methods used to launder the proceeds.  Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization.   These records, unlike controlled substances, are often maintained for long periods of time, even several years, based on my training and experience. Such records are often maintained under the dominion and control of the narcotics traffickers and money launderers, and as such, are often kept in their residences, businesses and/or storage facilities.

1

b. It is further my opinion, that based on my experience from participating in searches and from conversations with other experienced law enforcement officers who have participated in narcotics and money laundering related searches, drug traffickers who amass the proceeds of their enterprise, quite often secure their money within a secure location within their dominion and control, often in their residences, businesses, and storage facilities, and often in safes or other secure containers.

c. It is also my opinion, based on my training, experience, and observation, that large scale drug trafficking and money laundering requires the cooperation, association and communication between and among a number of people within the organization. As a result, people who traffic in narcotics or launder money for such organizations will possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates.

2. Based upon my training, experience, and participation in financial investigations involving money laundering or other efforts by defendants to conceal assets to avoid the detection of those assets by law enforcement, I have learned that:

a. Individuals attempting to conceal their illegal activities will frequently place assets obtained with proceeds of criminal activity in the names of friends, relatives, trusted associates, or fictitious entities to avoid detection of these assets by the Internal Revenue Service and other government agencies. Even though these assets are in the names of others, the true owners will continue to exercise dominion and control over the use, ownership, and disposition of these assets.

b. Individuals involved in money laundering will utilize checking and savings accounts at financial institutions in the names of relatives, friends, trusted associates, or fictitious business entities. These relatives and associates also conduct financial transactions on the individuals' behalf utilizing monetary instruments, including wire transfers of monies into foreign accounts outside the United Stated.

c. Individuals involved in money laundering will frequently have some sort of legitimate income or funds and co-mingle their criminal profits with their legitimate funds. This helps conceal the illegal source. Monetary instruments can then be acquired against the funds in the account or a check can simply be written on the account without creating any Currency Transaction Reports or suspicious activity.

2

d. Individuals involved in money laundering will frequently allow third parties/coconspirators to make cash deposits to their bank accounts. An individual depositing currency is not typically required to show identification to banking officials, therefore, a third party can go to a bank branch anywhere in the US and deposit cash to an account that is not held in their name. Because the funds are deposited in cash, the account holder, who can be in a different state, can then go to their local bank branch and immediately withdraw the funds in cash. This method of transferring money provides for an almost instantaneous transfer of funds that could not be achieved through the shipping of bulk currency via common carrier and maintains the virtual anonymity of the third party making the deposit which would not be possible if transferring money through wire a service business such as Moneygram or Western Union.

e. Individuals who are attempting to conceal their illegal activities from the IRS and other government agencies commonly hide records that will establish their true ownership of assets. Such records typically include: bank statements, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, automobile titles, property deeds, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

f. Individuals who seek to hide such records typically keep those records in a place that is secure but easily accessible, such as their personal residences, garages, automobiles, storage facilities, safety deposit boxes, briefcases, purses, and safes or security storage containers.

3. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.[1] This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.

4. I am an investigative or law enforcement officer of the United Stated within the meaning of Section 2510(7) of Title 18, United Stated Code, in that I am empowered by law to

---

[1] Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

Case 2:12-mj-00541-WEC   Filed 08/28/12   Page 4 of 94   Document 1

conduct investigations of and to make arrests for federal felony offenses.

5.     The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; documentary evidence; physical surveillance; and court authorized wire and electronic surveillance.  However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested criminal complaint, corresponding arrest warrants, and search warrants.

## II.     PERSONS FOR WHOM A CRIMINAL COMPLAINT AND ARREST WARRANT IS SOUGHT

6.     This affidavit is submitted in support of an application for a criminal complaint and corresponding arrest warrants for STEVEN JONES, GETHARIA M. SMITH, OLIVER JONES, DEVON CHASE COLE, JOSE DURAN, CHALUNDA SMITH, TIFFANY M. MARTINEZ, JESSICA TALSKY, DEAN ROUSE, WILLIAM BANKSTON, and NICOLE TALSKY who have committed, and will continue to violations of Title 21, United Stated Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications facilities to facilitate controlled substance felonies); and Title 18, United Stated Code, Sections 1952 (interstate travel or transportation in aid of racketeering enterprises), and 1956 and 1957 (money laundering) (Target Offenses).

## III.     LOCATIONS TO BE SEARCHED

7.     This affidavit is also submitted in support of an application for search warrants to

4

seek evidence of violations of the above Target Offences for the below listed Target Locations:

A. **The J-Spot Restaurant 3872 N. Teutonia Avenue, Milwaukee, Wisconsin (Business of Steven JONES)** – This location is described as a 2 and ½ story building with a pizza restaurant business on the ground floor, and a development company on the second floor. The red brick building has a green shingled roof, with dark trim and a black awning over the front windows. The awning displays the words "The J Spot, Pizza and More" in white letters. The numbers "3872," also in white, are displayed on a separate black awning over the front door to the business which faces west. A yellow colored sign with the words "J Spot Pizzeria" in black writing hangs on the south side of the building in close proximity to the restaurant entrance (**LOCATION A**).

B. **Milwaukee Developers, LLC, 3872A N. Teutonia Avenue, Milwaukee, Wisconsin (Business of Steven JONES)** – this location is described as a 2 and ½ story building with a pizza restaurant business on the ground floor, and a development company on the second floor. The red brick building has a green shingled roof, with dark trim and a black awning over the front windows. The awning displays the words "The J Spot, Pizza and More" in white letters. The numbers "3872," also in white, are displayed on a separate black awning over the front door to the business which faces west. A yellow colored sign with the words "J Spot Pizzeria" in black writing hangs on the south side of the building in close proximity to the restaurant entrance (**LOCATION B**).

C. **3928 N. 41st Street, Milwaukee, Wisconsin (Residence of Steven JONES)** – This location is described as a 2 and ½ story single family residence. The residence is constructed with tan bricks on first floor of the residence, and tan siding on the upper floor. The structure has brown trim and a light brown shingled roof. The brown colored front door of the residence faces west and the numbers "3928" are displayed to the right (south) of the front door, black in color on a white background, and are positioned over the mailbox to the residence (**LOCATION C**).

D. **3427 N. 67th Street, Milwaukee, Wisconsin (Residence of Getharia SMITH)** - This location is described as one of the Dineen Park Townhouses, a multi-unit building, with a black and grey shingled roof. The residence is constructed with red brick on the lower portion of the residence and tan siding on the upper part. The numbers "3427" are located above the door. A large picture window is located to the right (east) of the front door. The building is in the shape of an "L," and 3427 is the corner unit at the southeast corner. The front door faces south and there are high bushes across from the door. The residence is accessed by a common sidewalk around the building (**LOCATION D**).

5

E. **5233 W. Center Street, Milwaukee, Wisconsin (Getharia SMITH's Candy Store)** – This location is described as a multi-use building with businesses on ground floor and apartments. The business has a white banner across the top that reads "Smiths Sweet Shop." The windows of the business are painted with pictures of candy. The front door faces northwest. Tan pillar is in front of the door. The numbers "5233" are affixed above the door. There are red terra cotta shingles and tan brick facing. Apartments are located above the candy shop. (**LOCATION E**).

F. **2444 N. 15th Street, Milwaukee, Wisconsin (Residence of Oliver JONES)** – This location is described as a 2 story single family residence. The residence is constructed with tan siding and a light brown shingled roof. The structure has tan trim on the upper level of the building, and tan and white trim on the lower front of the residence. The front door to the residence faces west, and is covered by a white colored screen door. The numbers "2444" are black in color, and are displayed on the white trim connected to the overhang over the front porch. The numbers are positioned over the tan and white wooden steps leading up to the front door of the residence (**LOCATION F**).

G. **A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, Wisconsin, Unit Number E-09 (Storage Unit rented by Getharia SMITH and CHALUNDA Smith)** - There is no address on building, but is identified by a large sign on Granville Road with the name A1 STOR-ALL. A security fence and gate surrounds the compound, which contains numerous structures that each contains multiple storage units. The structures are tan sheet metal buildings with white overhead garage doors for each individual storage unit. Numbers for the individual storage units are on the white doors in black lettering. The business is on the east side of Granville Road and has a stone driveway. It requires a pass code to enter the access gate (**LOCATION G**).

H. **A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, Wisconsin, Unit Number E-10 (Storage Unit rented by Getharia SMITH and CHALUNDA Smith)** - There is no address on building, but is identified by a large sign on Granville Road with the name A1 STOR-ALL. A security fence and gate surrounds the compound, which contains numerous structures that each contains multiple storage units. The structures are tan sheet metal buildings with white overhead garage doors for each individual storage unit. Numbers for the individual storage units are on the white doors in black lettering. The business is on the east side of Granville Road and has a stone driveway. It requires a pass code to enter the access gate (**LOCATION H**).

I. **A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, Wisconsin, Unit Number C-41 (Storage Unit rented by Stephen JONES and Verlencer JONES)** - There is no address on building, but is identified by a large

sign on Granville Road with the name A1 STOR-ALL. A security fence and gate surrounds the compound, which contains numerous structures that each contain multiple storage units. The structures are tan sheet metal buildings with white overhead garage doors for each individual storage unit. Numbers for the individual storage units are on the white doors in black lettering. The business is on the east side of Granville Road and has a stone driveway. It requires a pass code to enter the access gate (**LOCATION I**).

J. **3039A S. 43rd Street, Milwaukee, Wisconsin (Residence of Jessica TALSKY)** - This location is described as the upper a two family residence upper/lower. The structure is a red/cream colored brick cape cod with brown trim. The numbers "3039A" are affixed to the brick on the front (east) facing at the southeastern corner. There is a concrete driveway on the south side of the residence. Access to 3039A is gained from the rear. This door is cream colored and faces south. The door is just east of the garage which is attached to the structure (**LOCATION J**).

## IV. BACKGROUND OF THE INVESTIGATION

8. This is a joint investigation involving the United Stated Department of Justice, Drug Enforcement Administration (DEA), the Milwaukee High Intensity Drug Trafficking Area Drug Gang Task Force (HIDTA), the Federal Bureau of Investigation (FBI), and the Milwaukee Police Department (MPD). Steven JONES has been a large scale cocaine trafficker in the Milwaukee area since 1996. Over the past decade, JONES has continuously associated with other large scale cocaine and marijuana traffickers, including Getharia M. SMITH (Gek), and has been identified as a target in investigations conducted by the DEA, FBI, and MPD. This investigation was initiated in September 2010 based on information obtained from multiple confidential sources that identified JONES and SMITH as significant cocaine traffickers.

9. According to these sources, the Steven JONES Drug Trafficking Organization (DTO) distributes large quantities of cocaine in the Milwaukee area and is routinely receiving kilogram and multi-kilogram shipments of cocaine. Based upon source information, telephone records, physical surveillance, and court authorized monitoring of wire and electronic

7

communications, it is believed the DTO has multiple sources of supply for kilogram quantities of cocaine and heroin. The DTO's primary sources of cocaine are believed to be a relative of JONES named Devin Chase COLE in Rockford, Illinois, and unknown individuals in Chicago, Illinois and Houston, Texas. The DTO's primary heroin source is an unknown individual in the Milwaukee area.

10. The investigation to date has included traditional law enforcement methods, including, but not limited to, interviews with confidential informants and sources; the gathering and analysis of information from other law enforcement agencies; the gathering and analysis of documentary evidence; the analysis of pen register, trap and trace, and telephone toll data; physical surveillance; the controlled purchases of narcotics; and court-authorized interceptions and surveillance.

## V. TARGET SUBJECTS

11. Information about the Target Subjects comes from the following sources and criminal indices: oral and written reports of other law enforcement officers; and from records, documents, and other evidence obtained during this investigation. I have obtained and read official reports prepared by various law enforcement officers participating in this investigation and in the other related investigations. When I refer to vehicle ownership in this affidavit, I, or other case agents, have reviewed the relevant state records from the Wisconsin Department of Transportation (WDOT), or the equivalent agency in other stated. When I refer to the criminal history of a subject, I, or other case agents, have read the available criminal history from state or federal agencies. When I refer to telephone subscriber or toll records, I have read the subscriber or toll records obtained from the telephone company by administrative subpoena, grand jury

8

subpoena, or court order, or I have obtained the information from other law enforcement officers familiar with this investigation. Through a review of that information, the following persons have been identified as the Target Subjects:

    a. STEVEN JONES (M/B, DOB: 11/20/68): leader of the JONES DTO and its primary distributor. JONES obtains multiple kilogram quantities of cocaine which are distributed in the Milwaukee area by the DTO. JONES was the primary user of STT3 and STT5, and was the primary user of a pager with phone number 414-222-0433 (hereinafter referred to as STT4) and STT6 (cellphone). Convictions: Possession with Intent to Deliver (PWID), Milwaukee County Circuit Court (MCCC) Case # F880586; PWID, MCCC Case # F903559; PWID, MCCC Case # F941943; and Manufacture/ Deliver Cocaine, MCCC Case # F034224;

    b. GETHARIA M. SMITH, a.k.a. Gek, Fat Boy, and Gat (M/B, DOB: 4/30/70): a high level member of the DTO, a close associate of Steven JONES, and a primary distributor for the DTO. SMITH sells large quantities of cocaine and crack cocaine and assists in processing cocaine into crack cocaine. SMITH also distributes marijuana and heroin. SMITH was the primary user of GTT2, and the primary user of GTT3. Conviction - PWID, MCCC Case # F024834;

    c. OLIVER JONES, a.k.a. Lil Joe & Lil JONES (M/B, DOB: 12/7/67): brother of Steven JONES and high level member of the DTO. OLIVER picks up large shipments of cocaine, sells large quantities of cocaine, delivers cocaine to customers who placed orders to Steven JONES, and operates businesses believed to be used launder drug proceeds. No drug related convictions;

    d. DEVON CHASE COLE, a.k.a. Chase (M/B, DOB: 12/27/82): a primary cocaine source for the DTO, supplying kilogram quantities of cocaine. COLE lives in Rockford, IL, and is believed to be related to Steven JONES. COLE recently supplied JONES with a large quantity of cocaine. No drug related convictions;

    e. CHALUNDA SMITH (F/B, DOB:12/25/74): sister of Steven JONES and the wife of Getharia SMITH who has been present with SMITH during drug transactions and is believed to assist with drug distribution-related activities of the DTO. No drug related convictions;

    f. TIFFANY M. MARTINEZ (W/F, DOB: 6/18/82): an associate of Steven JONES who stores and transports drugs for the DTO. MARTINEZ was arrested while transporting three kilograms of cocaine for SMITH and JONES in May of 2012. No drug related convictions;

9

g. JESSICA TALSKY (F/W DOB: 11/09/90): sells small and medium sized quantities of cocaine, heroin, and prescription pills for JONES, and assists JONES with obtaining pills. No drug related convictions;

h. NICOLE TALSKY (W/F, DOB: 3/5/92): the sister of Jessica TALSKY. NICOLE is employed at the J-Spot and also assists JONES in the distribution of controlled substances at the J-Spot and other locations. No drug related convictions;

i. DEAN ROUSE (M/B, DOB: 1/26/56): purchases ounces of cocaine from JONES, long time drug associate of JONES. ROUSE also acts as a handyman for JONES. No drug related convictions;

j. WILLIAM BANKSTON (M/B, DOB: xxxx): believed to be a distributor for SMITH and well as a middleman between SMITH and other sources of cocaine known to BANKSTON; and

k. JOSE ELPIDIO DURAN, a.k.a. MEX and/or Max (H/M, DOB: 5/31/81): JONES' and COLE's cocaine source of supplier who lives in Rockford, IL.

## VI. WIRE AND ELECTRONIC COMMUNICATION INTERCEPTS

12. Throughout the course of this affidavit, reference is made to intercepted communications to/from telephone being used by the Target Subjects. All referenced interceptions were made pursuant to the following court orders made pursuant to Chapter 119 of Title 18, United Stated Code:

a. On May 23, 2012, Judge J.P. Stadtmueller of the Eastern District of Wisconsin signed an order under Application 9197 authorizing the interception of wire and electronic communications to/from a cellular telephone being used by Getharia SMITH, 414-627-7811 (GTT2), for a period of 30 days. On May 24, 2012, case agents began communications to/from GTT2. Authorized monitoring of GTT2 ended on June 22, 2012.

b. On June 25, 2012, Judge J.P. Stadtmueller of the Eastern District of Wisconsin signed an order under Application 9197 authorizing the interception of wire and electronic communications to/from a cellular telephone being used by Steven JONES, 832-382-6046 (STT3), and a cellular telephone being used by Getharia SMITH, GTT2, for a period of thirty days. The interception of communications to/from STT3 began on June 25, 2012 and ended on July 20, 2012. The interception of communications to/from GTT2 began on June 26, 2012 and ended

10

on July 20, 2012.

    c.    On August 10, 2012, Judge J.P. Stadtmueller of the Eastern District of Wisconsin signed an order under Application 9197 authorizing the interception of wire and electronic communications to/from a cellular telephone being used by Steven JONES, 414-855-4029 (STT6), and a cellular telephone being used by Getharia SMITH, GTT2, for a period of thirty days. The interception of communications to/from STT6 began on August 13, 2012 and continues to date.

## VII.    CONTROLLED BUYS AND CONTACTS AND RECORDED CALLS

    13.    Throughout the course of the investigation of the JONES DTO, case agents have made several controlled buys of cocaine and cocaine base from members of the DTO. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equip.m.ent to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.

    14.    All of the calls/texts to the target by the informants were consensually recorded calls/texts under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observed the informants dial the target's number on each occasion.

11

Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures.

## VIII.  PROBABLE CAUSE

15.     During various times throughout this investigation, the below referenced confidential sources (CSs), provided information to case agents regarding the drug trafficking activities of JONES and their drug trafficking associates:

### Information provided by Confidential Source 2 (CS-2)

16.     For several reasons, case agents believe CS-2 is a credible and reliable person. First, CS-2 has given case agents information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, CS-2 has made statements to case agents that are against his/her penal interests, in that CS-2 has admitted his/her involvement in the DTO's activities in the past. Third, CS-2 has made recorded phone calls and controlled buys of cocaine from Getharia SMITH, who was identified by case agents as a close associate and high level member of the JONES DTO.  CS-2 has several prior felony convictions: Reckless Injury–Causing Bodily Harm, Retail Theft, Carrying a Concealed Weapon, Prohibited Person with a Firearm, Felon in Possession of a Firearm, and Burglary.  CS-2 is cooperating with case agents for favorable consideration toward a pending felony Burglary case.

17.     CS-2 was interviewed by case agents in June and August of 2011, regarding the drug trafficking activities of the JONES DTO.  CS-2 has known Steven JONES for several years and positively identified a photo of Steven JONES as the leader of the JONES DTO. CS-2 also knows Steven JONES' brother "Lil-JONES" and viewed a Wisconsin DOT photograph of OLIVER Jones which CS-2 positively identified as "Lil-JONES."  CS-2 also knows Steven

12

JONES brother-in-law, Getharia SMITH, who CS-2 knows by the street name of "Gek." CS-2 has known SMITH for several years and viewed a booking photo of SMITH which CS-2 positively identified as Getharia SMITH, a.k.a. "Gek." CS-2 was purchasing marijuana and cocaine from SMITH on a daily basis for approximately 3 to 4 years until CS-2 was arrested and began cooperating with law enforcement. CS-2 stated that SMITH had a cellular phone with number 281-743-4428 and that SMITH drives a blue Acura SUV.

18.     CS-2 stated SMITH and JONES are associated with a business located at 3872 N. Teutonia Avenue. CS-2 stated that in December 2010, the building was being renovated and CS-2 observed JONES use a key to enter the building. Case agents have independently confirmed through public records, MPD reports, and physical and video surveillance that the J-Spot Restaurant located at 3872 N. Teutonia Ave. is owned by JONES, that drugs are sold from this location, and that SMITH has delivered drugs to CS-2 after leaving the J-Spot (**LOCATION A**).

19.     As detailed below, CS-2 made numerous controlled drug purchases from SMITH and has arranged these deals by contacting SMITH on SMITH's cell phones, including 281-743-4428, 414-982-0879 (GTT1), and GTT2. CS-2 and SMITH use coded language when arranging drug transactions over the telephone through both wire and electronic communications. CS-2 stated that s/he has been purchasing drugs from SMITH for years, and that when they have to communicate on the phone to arrange a drug deal not only do they use codes, but they also try to keep any conversations to only what is absolutely needed to arrange the drug transaction. Case agents asked CS-2 if s/he could talk about more of the specifics of the transaction, such as asking for a "B" to confirm that CS-2 wanted to purchase a one-eighth ounce quantity of cocaine. CS-2 stated that if s/he had been regularly purchasing eighth ounce quantities or they had previously

13

discussed the quantity that SMITH would already know this and that SMITH would become suspicious. CS-2 stated that if someone, including CS-2, talked about drug trafficking activity to SMITH over the phone that should have been mutually understood, then SMITH would think that this customer was working with the police and that SMITH then would hang up on them. I have interviewed numerous informants and suspects and know that drug dealers commonly assume that their telephone conversations are being monitored by the police and go to great lengths to disguise the actual intent of their drug related communications. I know that drug dealers frequently talk in code, say only what is absolutely necessary, arrange a part of their drug transactions in person, and even mumble and whisper in efforts to thwart law enforcement.

### Information provided by Confidential Source 6 (CS-6)

20.     For several reasons, case agents believe CS-6 is a credible and reliable person. First, CS-6 has given case agents information concerning individuals involved in drug trafficking, which case agents have independently verified.  Second, CS-6 has made statements to case agents that are against his/her penal interests, in that CS-6 has admitted his/her involvement in the DTO's drug dealing activities.  CS-6 has several prior felony convictions: Receiving Stolen Property, Armed Robbery, PWID-Cocaine, Robbery-Party to a Crime, Fleeing, Delivery of Cocaine, and PWID-THC. CS-6 has no pending criminal matters.  CS-6 is cooperating with case agents for no benefit in return.

21.     CS-6 was interviewed by investigators on multiple occasions in late 2011 and early 2012 regarding the JONES DTO.  CS-6 first met Steven JONES several years ago when they were both working for a drug supplier named G.H.  In approximately 2008, CS-6 was again associating with JONES and JONES was selling large quantities of cocaine on the south side of

14

Milwaukee. CS-6 stated that JONES has a brother-in-law who is known as "Gek" (later identified by photo as Getharia SMITH), that SMITH is very close with JONES, and distributes cocaine for JONES. CS-6 stated that Steven JONES has a brother named OLIVER Jones who also distributes cocaine for Steven JONES. CS-6 stated that OLIVER and SMITH are the primary distributors of the cocaine for the JONES DTO.

22. CS-6 began purchasing 1/8 ounce quantities of cocaine from Steven JONES in 2009. Initially, JONES gave CS-6 the cocaine on consignment (front) and the next day JONES would come by to pick up money from CS-6 and to deliver more cocaine. CS-6 purchased 1/8 ounce quantities of cocaine from JONES every day for about a week on credit. When CS-6 made enough money to pay for the cocaine when it was delivered, CS-6 began buying quarter-ounce, half-ounce, and one-ounce quantities of cocaine from JONES. CS-6 was buying the above listed quantities of cocaine from JONES several times a week and was getting a total of approximately 4-5 ounces of cocaine per week.

23. CS-6 stated that JONES owns a building located at 3872 N. Teutonia Avenue in Milwaukee and that JONES uses the building to distribute cocaine and to cook powder cocaine into crack cocaine. After purchasing the building, JONES had the building renovated and turned into a restaurant called the J-Spot. CS-6 stated that there is an apartment located on the second floor of this building that JONES uses for his drug dealing activities (**LOCATIONS A & B**).

24. CS-6 stated that in the spring of 2011, CS-6 went to the J-Spot Restaurant and purchased a 4 ½ ounce quantity of cocaine from Steven JONES. CS-6 received the cocaine from JONES in the apartment located above the restaurant. SMITH and another subject who goes by the street name of "J," who CS-6 later identified as Jermaine KIRK, were also present during this

15

drug transaction. CS-6 paid JONES $4500.00 for the cocaine. CS-6 purchased 4 ½ ounce quantities of cocaine from JONES approximately three more times (**LOCATIONS A & B**).

25.    CS-6 stated that JONES main source of cocaine is JONES' cousin, who CS-6 knows as "Chase" and who lives in Rockford, Illinois. CS-6 positively identified a booking photo of Devon Chase COLE as the subject CS-6 knows as "Chase." CS-6 told case agents that JONES buys kilogram quantities of cocaine from COLE. COLE drives a green mini-van with Illinois plates. According to CS-6, COLE has a Mexican source of supply from Chicago.

26.    CS-6 went to Rockford with JONES for the first time in 2009 and they each picked up one ounce of cocaine from COLE. CS-6 stated that they paid $1,100 per ounce of cocaine. CS-6 and JONES took two female subjects with them who agreed to hide the cocaine in their vaginas if they were stopped by the police. CS-6 went along with JONES on two more trips to Rockford to get cocaine from COLE. On one of these trips, JONES picked up a kilogram of cocaine and on the other trip JONES received an unknown amount of cocaine.

27.    CS-6 stated in the spring of 2011, CS-6 observed JONES cooking a large quantity of cocaine, either 4 ½ or 9 ounces, into crack cocaine in the apartment above the J-Spot. At the time, CS-6 observed JONES with a bag containing $32,000 in U.S. Currency because JONES was waiting to receive a kilogram of cocaine from COLE. (**LOCATIONS A & B**).

28.    CS-6 stated that JONES also associates with a Hispanic female by the name of Tiffany (MARTINEZ) who lives in the 1300 block of N. 49th Street. CS-6 stated that Tiffany purchases cocaine from JONES and stores large amounts of cocaine for JONES at her house.[2]

---

[2] MPD records reveal that on July 26, 2010, Tiffany M. MARTINEZ (F/W, DOB: 6/18/82) reported a burglary to her residence located at 1215 N. 46th Street. MARTINEZ gave officers her contact number as 414-326-5100. Telephone records reveal that 414-326-5100 has been in regular contact with JONES' known cellular telephone numbers. The subscriber for 414-326-5100 is listed as Crysta FONT of 8624 W. Lapham Street.

16

29.     CS-6 stated that Steven JONES has a "state of the art" surveillance system that was installed on the J-Spot prior to its opening for business.  CS-6 stated that s/he observed the camera system from the inside and knows that it gives JONES the ability to observe the front, the back, and the sides of the business.  CS-6 stated the surveillance system includes several screens on a desk in the west room of the apartment.  The system can show live video from cameras in the restaurant portion of the building as well as live video from cameras located on the exterior of the building.  CS-6 stated that the monitors can show four different views at a time.  JONES bragged to CS-6 that he could even monitor this surveillance system from his home computer. (LOCATIONS A, B & C)

### Information provided by Confidential Source 12 (CS-12)

30.     For several reasons, case agents believe CS-12 is a credible and reliable person. First, CS-12 has given case agents information concerning individuals involved in drug trafficking, which case agents have independently verified. CS-12 has also made controlled drug purchases from a mid-level member of the JONES DTO.   CS-12 has two prior felony convictions: 2nd Degree Murder and felon in possession of a firearm.  CS-12 is cooperating with case agents for monetary consideration.

31.     CS-12 was interviewed by case agents in spring of 2012 regarding the JONES DTO.  CS-12 indicated that s/he has known MORRIS Jones (a.k.a. MOE) for about one and a half years.  CS-12 knows MORRIS to be a member of the Ghetto Boys Street Gang.  I know from my training and experience that the Ghetto Boys Street Gang in Milwaukee is involved in narcotics distribution and narcotics robberies.  CS-12 said that MORRIS sells cocaine in one ounce and larger quantities and charges $1,200 per ounce.  MORRIS typically conducts drug

17

transactions at his mother's house which is the area of N. 9th Street and West Burleigh. CS-12 stated that MORRIS also sells cocaine at the J-Spot, located at 3872 N. Teutonia Avenue. CS-12 stated that MORRIS is a cook at the J-Spot and works from 9 a.m. to 5 p.m., Monday through Friday. CS-12 goes to the J-Spot every day that MORRIS is working. CS-12 stated that the J-Spot is owned by MORRIS' cousins, who CS-12 knows as "Gek," "Lil Joe, and "Steve O" (identified by photos as Getharia SMITH, OLIVER Jones, and Steven JONES respectively, referred to as the "owners" by CS-12). CS-12 is also aware that these individuals sell cocaine in large quantities from the J-Spot. CS-12 contacts MORRIS by calling cellular phone number 414-324-8340. CS-12 has made a number of controlled purchases of cocaine from MORRIS. MORRIS told CS-12 that he gets his cocaine supply from Steven JONES and SMITH, as well as others. Before beginning to cooperate with law enforcement, CS-12 indicated that the last time CS-12 purchased cocaine from MORRIS was sometime in late 2011. (**LOCATIONS A & B**)

32. CS-12 also stated that in early spring of 2012, CS-12 was inside the J-Spot visiting with MORRIS. Steven JONES, OLIVER Jones, and SMITH were also present, seated at a table near the front window of the restaurant. CS-12 stated he observed a brown paper bag sitting on the table occupied by JONES, OLIVER, and SMITH that contained approximately ½ kilogram of cocaine. CS-12 overheard and observed conversation about selling the cocaine to a subject with the alias of "Big Jimmy." CS-12 knows Big Jimmy as a member of the Ghetto Boy Street Gang in Milwaukee. CS-12 identified Big Jimmy by photo as Jimmy D. BROWN (M/B, DOB: 5/18/70). CS-12 stated that BROWN drove up in a gray Chrysler 300M with chrome rims. BROWN exited the vehicle and entered the J-Spot. After a short conversation between BROWN and the other individuals, BROWN pulled out bundles of money from his pockets. CS-

18

12 saw that the money was exchanged with OLIVER Jones, who then gave BROWN the brown bag containing the ½ kilogram of cocaine. BROWN then left the restaurant. (LOCATION A)

33.    CS-12 stated that s/he has observed numerous drug transactions inside the restaurant, with the quantities ranging from 1 ounce to a ½ kilogram of cocaine. CS-12 believes that the JONES DTO is distributing approximately 3 to 5 kilograms of cocaine per week. (LOCATION A)

34.    CS-12 also stated that in early spring of 2012, during a burglary at the J-Spot, cocaine was stolen. CS-12 stated that the drugs were stolen by a son of one of the owners of the restaurant. CS-12 stated that there was an amount of cocaine in a decoy duffel bag left on the stairs. CS-12 stated that use of a decoy is a common practice used by drug traffickers. S/he stated that when burglars find the quantity of cocaine they typically leave, and then miss a larger amount of drugs hidden elsewhere. CS-12 stated that drug traffickers also use this technique in an attempt to thwart law enforcement efforts during the execution of a search warrant. CS-12 stated that the owners of the J-Spot recovered the stolen drugs and physically punished (beat) the culprit. CS-12 stated that s/he has never been in the upstairs area of J-Spot, but believes that this is a location where large amounts of cocaine and money are kept. CS-12 stated that the owners of the J-Spot are protected by the Ghetto Boys street gang. CS-12 stated that the owners of the J-Spot are not actual members of the gang but are likely protected because of family relationships. (LOCATIONS A & B).

### Controlled Buys/Controlled Contacts/Recorded Calls

35.    On July 12, 2011, CS-2 made a controlled purchase of 3.30 grams of cocaine base for $150.00 from Getharia SMITH. CS-2 placed a recorded call to SMITH at 281-743-4428 on

19

July 11, 2011 to arrange the drug buy on July 12. On July 12, 2011, SMITH called CS-2 and told CS-2 that he (SMITH) was ready and to meet SMITH at the J-Spot, 3872 N. Teutonia Avenue. CS-2 was equipped with a recording device and $150.00 of buy money. SMITH then called CS-2 to change the meet location to the Walgreen's parking lot located at 2222 W. Capitol Drive. Case agents conducted surveillance observed SMITH walking from the back door of 3872 N. Teutonia Avenue (J-Spot) and getting into a blue Acura SUV bearing WI plate 148-SNB. This vehicle was also occupied by CHALUNDA Jones who case agents know to be Steven JONES sister and SMITH's wife. SMITH and CHALUNDA were then observed driving directly to the Walgreen's parking lot, where SMITH met with CS-2. SMITH was observed taking something out of his pocket and leaning into CS-2's vehicle. After the deal, CS-2 left the area and met case agents at a predetermined meet spot. CS-2 turned over 3.30 grams of cocaine that was purchased from SMITH. (**LOCATIONS A & B**).

36.     On August 1, 2011, CS-2 went to the 3872 N. Teutonia Avenue (J-Spot) to obtain intelligence on the JONES DTO. Case agents observed CS-2 in front of 3872 N. Teutonia Avenue at 8:01 p.m. While in front of this address, CS-2 was observed meeting with OLIVER Jones. During the conversation, CS-2 discussed previously selling Steven JONES three televisions. OLIVER stated that those T.V.'s were taken during a burglary of the J-Spot (MPD Incident# 11-052-0071). OLIVER told CS-2 that Steven JONES called in the complaint on February 20, 2011, but the burglary occurred on February 19, 2011. JONES told the responding officers that he didn't call it in immediately because he didn't have insurance and could not get

20

the surveillance camera to work properly. OLIVER provided CS-2 with his (OLIVER's) new cellular phone number of 414-303-3849.[3] (**LOCATIONS A & B**).

37.   On August 3, 2011, CS-2 made a controlled purchase of 8.80 grams of cocaine from Getharia SMITH for $300.00.

38.   On August 23, 2011, CS-2 made a controlled purchase of 3.5 grams of cocaine base from SMITH for $150.00. Case agents checked video surveillance footage which confirmed that SMITH left the J-Spot, entered his blue Acura SUV, and drove away from the restaurant to meet with CS-2 to conduct the deal. (**LOCATIONS A & B**).

39.   On September 5, 2011, CS-2 made a controlled purchase of 3.2 grams of cocaine base from SMITH for $150.00.

40.   On October 19, 2011, CS-2 made a controlled purchase of 7.0 grams of cocaine base from SMITH for $300.00. Case agents conducted surveillance regarding this drug transaction and observed SMITH in front of the J-Spot. Case agents then observed CS-2 arrive and park next to SMITH's blue Acura MDX (bearing WI plate 148-SNB) which was parked at approximately 3873 N. Teutonia Avenue. Case agents observed SMITH walk across the street and meet with CS-2, and then walk back to, and enter the J-Spot. Case agents met CS-2 back at a predetermined meet spot and CS-2 provided agents with 7.0 grams of cocaine base and the digital recording device used to record the transaction. CS-2 confirmed that he/she purchased the cocaine base from SMITH for $300. (**LOCATIONS A & B**).

---

[3] MPD records regarding the above burglary incident at the J-Spot reveal that Steven JONES stated that he owned the "J-Spot Pizza Place" and at the time of the incident it was under construction. JONES confirmed that he has an alarm system with video cameras at the J-Spot and stated that he lived at 3928 N. 41st Street and that his cell phone number was 414-426-9266.

21

41.    On January 9, 2012, CS-2 made a controlled purchase of 3.38 grams of cocaine base from Getharia SMITH for $300.00. During the deal, CS-2 noted that the amount of cocaine base was short the amount normal for $300. SMITH told CS-2 he would get CS-2 the shorted amount on the next day. On January 10, 2012, during a controlled encounter, CS-2 received 3.18 grams of cocaine base from Getharia SMITH, which was the amount shorted CS-2 during the controlled buy on January 9 noted above.

42.    On February 15, 2012, during the evening hours, case agents viewed video surveillance footage from the stationary video camera monitoring the J-Spot. At approximately 3:39 p.m., OLIVER Jones exited the restaurant and stood in the front doorway scanning the area. A short time later, Steven JONES was observed walking up to the restaurant carrying a big green bag under his right arm. Steven JONES was observed going around OLIVER and directly into the front door of the restaurant. MORRIS Jones was then observed with OLIVER standing in front of the restaurant and they were both looking around in a manner consistent with conducting counter surveillance. OLIVER was then observed backing his way into the restaurant while continuing to scan the area. (**LOCATIONS A & B**).

43.    On February 15, 2012, at 4:29 p.m., CS-2 placed a recorded phone call to SMITH (GTT1) and told SMITH that s/he needed to speak to him. SMITH responded by telling CS-2 to "text" him the order and the call ended. CS-2 then sent a text message to GTT1 which read, "Ball" (code for a 1/8th ounce quantity of cocaine). CS-2 also sent a second text which read, "What's up" and SMITH replied, "K." CS-2 and SMITH continued to text each other and SMITH relayed that he wanted CS-2 to go to the "Spot." Case agents supplied CS-2 with $150 of buy money and a digital/audio recording device and CS-2 responded to the area of the J-Spot.

22

Case agents conducted surveillance regarding this drug transaction and observed CS-2 arrive at the J-Spot (**LOCATION A**) and depart a short time later. CS-2 notified case agents that he/she was called by SMITH and told to go to the area of 49th Street and W. Roosevelt Drive. A short time after CS-2 drove away from the J-Spot, case agents observed SMITH leaving the J-Spot. CS-2 called a second time to notify case agents that SMITH had changed the meet location again to the 4200 block of W. Roosevelt Drive. Case agents observed CS-2 parked in the 4200 block of W. Roosevelt Drive and then leave the area a short time later. CS-2 notified case agents that he/she met with SMITH and that SMITH was driving a light green mini-van. Case agents then observed SMITH arriving back at the J-Spot restaurant. SMITH was observed entering the restaurant and looking out the front window, conducting counter surveillance. Case agents observed SMITH get back into the green mini-van and drive away from the restaurant. A short time later, case agents located a green mini-van driving on N. Teutonia Avenue with Wisconsin plate "284-TRX." A check with Wisconsin DOT revealed that this plate listed to CHALUNDA SMITH (JONES) of 4170 N. Sherman Boulevard on a 1997 Chevrolet Venture minivan. A review of footage from the video camera monitoring the J-Spot also shows this van parked at the J-Spot. Case agents met with CS-2 who stated that s/he met SMITH at 4247 W. Roosevelt Boulevard. CS-2 provided agents with cocaine purchased from SMITH and the audio/video recording device used to record the transaction. Case agents examined the cocaine purchased from Smith and noted that it contained a large solid chunk that appeared to have been broken of the corner of a kilogram "brick" of cocaine. Case agents know that bulk quantities of cocaine are frequently processed and packaged in brick shaped one kilogram quantities. It is believed that CS-2 received cocaine instead of cocaine base because Steven JONES had recently brought the

23

cocaine to the restaurant and that it had not been processed into cocaine base. Telephone records reveal that GTT1 sent a text message to JONES cell phone, 414-499-2882, about 11 minutes prior to JONES delivery of the bag at the J-Spot. (**LOCATIONS A & B**).

44.     Court-authorized cell phone location data for JONES' cell phone with number 414-499-2882 revealed that on the morning of February 26, 2012, JONES' cell phone was located in the area of 3928 N. 41st Street in Milwaukee. (**LOCATION C**). At approximately 7:34 a.m., there was an outgoing call from 414-499-2882 to 815-793-9586. A check of records from a publicly maintained data base revealed that Devin C. COLE (DOB: 12/27/82) has a current address of 216 Adams Street, Apartment 1, Rockford, Illinois and a phone number of 815-793-9586. A check of phone records for this phone number revealed the subscriber as "James None Hill" (DOB: 5/6/82) at "None, None, None." COLE is suspected by case agents to be one of the JONES DTO's main sources of cocaine supply. The location data for 414-499-2882 indicated that JONES then traveled to Rockford and that during the trip JONES' made and received calls with phone number 815-793-9586. Location data revealed that JONES stopped in the area of 216 Adams Street in Rockford for about one hour. Location data indicated that on the return trip to Milwaukee, JONES made a short stop in the area of the home of Tiffany MARTINEZ, located at 1215 N. 46th Street. As indicated above, CS-6 stated that JONES associates with a Hispanic female by the name of Tiffany who lives in the 1300 block of N. 49th Street and that Tiffany holds drugs for JONES.

45.     Location data indicated that JONES then proceeded to the J-Spot. A check of the stationary video footage confirmed that JONES arrived at the J-Spot. JONES was observed arriving in a red Ford Focus hatchback with Wisconsin License plate 530-SCH. When JONES

24

arrived, he retrieved a duffle bag from the hatchback and then entered the J-Spot via the front door of the business. A further review of the video footage revealed that the restaurant was closed, and that Getharia SMITH, OLIVER Jones, and Anthony PAUL came to the restaurant while JONES was still there. SMITH was then observed leaving the restaurant and appeared to be holding a bag in his left hand and PAUL was also observed conducting a suspected drug transaction. (**LOCATIONS A & B**).

46.     On March 16, 2012, law enforcement officers and a canine partner discovered a suspicious package while conducting interdiction investigations at a Federal Express Sort Facility located in Milwaukee.  The canine partner indicated for controlled substances on a brown cardboard box measuring 17" x 17" x 7" and bearing a shipping label with air bill number 8987 5913 7322, sent from Susan Jones, 2506 Camille Street, Houston, TX 77506, and addressed to Estella Jones, 5233 W. Center, Milwaukee, WI 53210.  A check of law enforcement records regarding Susan JONES and 2506 Camille Street, Houston, TX 77506, revealed that no one with that name is associated with that address. Law enforcement records regarding Estella Jones reveal that Estella Jones has been deceased since 1999.   Case agents conducted surveillance of 5233 W. Center and observed that this location is a first floor, corner store front located in the building at the intersection of N. 53rd Street and W. Center Street.  A state search warrant for the suspicious package was obtained by the investigators.  The warrant was executed and the package was opened; it was found to contain nine "Great Value," 29 ounce fruit cans. Investigators examined the cans and observed that the cans had been opened and resealed. The cans were opened and found to contain baseball sized quantities of suspected marijuana which were packaged in vacuum sealed bags and wrapped in plastic wrap.  The cans also contained

25

mixed fruit in syrup that was on top of the sealed bags of marijuana. The suspected marijuana was tested with positive results, total weight of 1347 grams without containers. The package was resealed and investigators decided to attempt a controlled delivery of the package to 5233 W. Center Street. (**LOCATION E**).

47. Prior to the attempted controlled marijuana delivery, investigators conducted surveillance of 5233 W. Center Street and observed a green Dodge Ram pickup with WI registration JB6343 parked directly in front of the front door of this location initially, but then left the area. WDOT records for JB6343 indicate the plate is listed to Amber U. Smith on a green 1995 Dodge Ram pickup truck. Case agents know that Amber U. Smith is the daughter of Getharia SMITH and CHALUNDA SMITH (nee JONES). Investigators also observed a black male subject, who was later identified as Getharia SMITH, standing inside 5233 W. Center Street and looking out the front door windows and sidewalk windows as though he was anticipating the delivery of the marijuana. (**LOCATION E**).

48. At approximately 10:55 a.m., an undercover officer (UC), acting as a Federal Express delivery man, approached the entrance of 5233 W. Center Street and knocked at the front door. SMITH, who was inside the store and talking on a silver flip cell phone, came to the front door but did not open the door. Smith held up his finger and motioned toward the UC to hold on and then walked towards the back of the store as he continued his conversation on the silver flip cell phone. The UC knocked on the door again and eventually SMITH returned and unlocked and opened the front door. SMITH was holding a different cell phone which was not the silver flip cell phone he had been using when he originally came to the door. The UC asked SMITH if he was affiliated with the addressee, Estella Jones, and if he was expecting a delivered

26

package coming from Houston. SMITH, who appeared to be extremely nervous, began looking beyond the UC and up and down the street. The UC and other investigators in the area conducting surveillance noted that it appeared to them that SMITH was checking the area for the Fed Ex delivery truck and/or the presence police. (**LOCATION E**).

49. At this time, another investigator dressed in plain clothes approached the front door of 5233 W. Center and stood next to the UC. SMITH looked at the other investigator and then stated that he was not expecting a delivery. The UC and the investigator then identified themselves as the police and SMITH gave them permission to enter the store so they could talk with him. The investigators asked SMITH to end his "phone conversation" and SMITH complied. SMITH indicated that he was the leasee and that he was in the middle of opening "SMITH'S SWEETS SHOP." SMITH stated that he was at the location awaiting employees of the City Inspection Services to arrive to conduct inspections prior to opening and that they were due at any moment. Investigators observed that there were no signs posted or displayed and the windows were mostly covered with black plastic and that the store appeared to still be under construction. Investigators also observed that there was candy displayed for sale without any prices posted, and there was no cash register. SMITH gave investigators permission to search his person, his cell phone call history, and to look around the store. Investigators checked the phone that SMITH appeared to be talking on, a black cellular telephone with number 414-982-0879 (GTT1), which revealed that it had not received or made any calls for approximately one hour. SMITH was found to be in possession of $1,173.00 in U.S. currency which SMITH referred to as being "nothing." SMITH stated that the first phone he was observed with was behind the counter, or that it might be in his pocket. Investigators located this phone in the basement at the

27

bottom of the steps. It was broken into pieces and appeared to have been thrown down the stairs. Investigators were able to put the cell phone back together, turn it on, and observed that it was a Samsung Model# SCH-R260U cellular telephone with phone number 414-419-1164. The last call made over the phone was to a subject stored as "BIG MAN" with phone number 414-499-5402 at 10:56 a.m. SMITH became very irate at this time and claimed that he was being harassed and picked on by the police. SMITH was then handcuffed and placed in custody. Investigators observed documents listing SMITH as the lessee, and located two signs with "SMITH'S SWEET SHOP" in the store. (LOCATION E).

50. Investigators contacted the landlord for 5233 W. Center Street who stated that SMITH has been his/her tenant for over three months. A check with the City of Milwaukee Neighborhood Services revealed that there was no record of a store at this location and that there was no record of anyone from Neighborhood Services responding to the location. While investigators were conducting their investigation, they noticed the green Dodge Ram truck circling the area with a black female driving and a black female as a passenger. A female subject identified as P.S.M. then arrived at the store and inquired about the status of the store. Investigators interviewed P.S.M. who stated that she had been sent by CHALUNDA, who was driving the green Dodge Ram and was waiting in the area, but did not want to approach the store while police were there. She could not reasonably explain any of this behavior.

51. SMITH was conveyed to HIDTA and investigators conducted a recorded, *Mirandized* custodial interview of SMITH who stated that he is married to CHALUNDA SMITH (a.k.a. CHALUNDA JONES) and that CHALUNDA was with him at the store and left to go to Burger King before the police arrived. SMITH stated that he was an unlicensed carpenter that

28

worked for family and that he had the cash from flipping some used vehicles. SMITH went through the two vehicles he had sold and the total income came out to approximately $800 dollars over the past several months. SMITH stated that he had observed an undercover vehicle pass by his business and knows that vehicle to be affiliated with the HIDTA, even though he has never been arrested or stopped by the HIDTA. SMITH described approximately four vehicles in the HIDTA undercover fleet that were known by him to be affiliated with Milwaukee HIDTA, including a white Escalade that he stated he observed just prior to the police coming to his door with a parcel. SMITH stated that at that time he was just standing at the door looking out the front door for no apparent reason. SMITH could not reasonably explain why he was standing there for such a long period of time, and exactly why or what he was awaiting on. SMITH stated that he then got a call and couldn't explain why this cell phone was found at the bottom of a stairway broken into pieces. SMITH refused to give information regarding "Big Man" or why SMITH had called him after observing a police vehicle by his store. SMITH was argumentative and evasive in his answers and the interview was stopped. He was then released from custody. Due to the ongoing investigation described throughout this affidavit, SMITH was not charged in state or federal court for the events that occurred on March 16, 2012. (**LOCATION E**).

52.     Based on the above information and my training and experience, I believe that the marijuana was intended for SMITH because: it was delivered to SMITH's new business; SMITH was observed outside of the store looking around as if were awaiting the delivery of the marijuana; SMITH destroyed one of his cell phones; SMITH lied to the police regarding the cell phones and the call made after observing a police undercover vehicle; and SMITH's admitted knowledge of the identity of undercover vehicles used by law enforcement. I know that drug

29

dealers use cell phones extensively when conducting drug related activities and believes that the above listed cell phones contain information that constitutes evidence of SMITH's drug trafficking activities including the phone numbers and contact name information of SMITH's drug sources of supply and drug customers. (**LOCATION E**).

53. On March 23, 2012, CS-2 made a controlled purchase of 1/8 ounce quantity of cocaine base from SMITH for $300.

54. On April 16, 2012, CS-2 made a controlled purchase of 3.33 grams of cocaine from SMITH for $150.00.

55. On May 9, 2012, CS-12 made a controlled purchase of approximately one ounce of cocaine base from MORRIS Jones for $1200.00 at the J-Spot. Case agents conducted surveillance regarding this buy and observed CS-12 entering and later leaving the J-Spot. CS-2 then met with case agents at a predetermined meet spot and CS-12 turned over the digital recording device and a plastic baggy containing approximately one ounce of cocaine. CS-12 confirmed that s/he purchased the cocaine from MORRIS for $1200.00. CS-12 further stated that upon entering the J-Spot, s/he met with MORRIS in the restroom and gave MORRIS the $1200.00 of buy money. MORRIS counted the money and told CS-12 that he had to run upstairs to get the cocaine. While CS-12 was waiting in the restaurant, CS-12 observed other suspected drug customers in the restaurant. CS-12 stated that MORRIS was cooking food in the kitchen and that MORRIS kept going upstairs and then coming back down while continuing to cook food. CS-12 stated that eventually MORRIS came out of the kitchen and CS-12 and MORRIS again went into the bathroom where MORRIS gave CS-12 the cocaine. MORRIS stated that

30

they just cooked it which led CS-12 to believe that someone was upstairs cooking cocaine into cocaine base. (**LOCATIONS A & B**).

56.     On May 23, 2012, at approximately 6:39 p.m., a Texas State Trooper conducted a traffic stop of Tiffany M. MARTINEZ, previously been identified as an associate of Steven JONES who stores drugs for the DTO, in Chambers County, Texas. MARTINEZ was driving a blue Jeep Patriot Budget rental car with Illinois license plate L274639. MARTINEZ was stopped for a traffic violation. The investigating officer observed indicators that MARTINEZ was involved in transporting illegal drugs. A canine unit responded to the scene and a law enforcement canine trained in the detection of controlled substances conducted a free air search and alerted on MARTINEZ's vehicle. A subsequent search of the vehicle revealed that MARTINEZ was in the process of transporting approximately three kilograms of cocaine and $45,000.00 in U.S. currency (recovered from vehicle). Officers also recovered a pay stub for MARTINEZ from the J-Spot (**LOCATION A**), and a rental agreement in the name of MARTINEZ from the Budget Car Rental located at 5300 S. Howell Avenue, which is the Mitchell Field Airport location for Budget Rental cars in Milwaukee. MARTINEZ was arrested and detained in connection with this incident. MARTINEZ did not make a statement to investigating officers and she is currently out on bail. It should be noted that the traffic stop and subsequent arrest of MARTINEZ was done completely independent of this investigation, and case agents learned of MARTINEZ's arrest after she was already in custody.

57.     On May 24, 2012, at 10:23 a.m., SMITH (GTT2) received an incoming call from JONES (STT1). During this call, JONES and SMITH discussed transporting drugs through Texas. Based on previous investigation, I am aware that SMITH was in Texas during

31

MARTINEZ's traffic stop. JONES stated that the best thing to do is to have Texas plates and to use two cars and then switch them up. JONES stated that "he (the bail bondsman) said you pretty much need Texas plates to get out of Texas." SMITH agreed and admitted, "we pretty much knew that, but we didn't, you know, we, knew that you need Texas plates, but we was thinking rentals (rental cars) was smooth." JONES then told SMITH that "T" (Tiffany Martinez) was calling, that this is her first call time calling back, and that he needs to talked to her.

58. Case agents reviewed recorded jail phone calls from the Chambers County Jail where MARTINEZ was detained. On May 24, 2012, at 6:18 a.m., MARTINEZ had a phone conversation with JONES (STT1). During this call, MARTINEZ and JONES talked about the traffic stop. MARTINEZ asked where "Gat" (Getharia SMITH) was and then said, "That motherfucker was supposed to speed or something." JONES said, "I talked to your friend (SMITH). I said what was she doing up there? How come dude didn't punch it around and start speeding or something like that?" According to JONES, SMITH said he thought they [the police] were going somewhere else. MARTINEZ responded that she was a couple cars in front. She said she wasn't speeding and that they did not get her for speeding. She then said "they" [the police] saw that shit. JONES questioned why they didn't pull him (SMITH). MARTINEZ was very upset and stated, "they would have got him if he did what he was supposed to do." Based on these two calls, I believe that SMITH was driving behind MARTINEZ in another vehicle and that when MARTINEZ was pulled over by the police, SMITH was supposed to make an obvious illegal driving maneuver and draw the law enforcement officer's attention away from MARTINEZ so she would not be caught with load of cocaine that she was transporting. JONES was upset about the traffic stop and subsequent drug and money seizure and he stated that,

32

"Some motherfuckers gonna get their head knocked off for real."

59.     On May 25, 2012, at 11:28 a.m., SMITH (GTT2) received an incoming text message from JONES which read, "new number." JONES sent this message on a new cell phone (STT2). I know that JONES frequently changes cell phone number in an effort to thwart law enforcement authorities. I believe that JONES changed his cell phone number because of MARTINEZ's arrest.

60.     On May 25, 2012, at 9:14 p.m., SMITH (GTT2) received a call JONES (STT2). During this call, JONES told SMITH that "Chase's guy" was "ripped" for 1.2 million dollars. I know that Devon Chase Cole (a.k.a. "Chase") is one of JONES' sources of supply for kilograms of cocaine. JONES further stated that Chase's guy (drug source) should have purchased a house in the suburbs and hid the money there.

61.     On May 26, 2012, at 10:12 a.m., SMITH (**GTT2**) received an incoming call from JONES (STT2). During this call, SMITH and JONES talked about Tiffany MARTINEZ and that she was set up when she was arrested with the cocaine. SMITH and JONES discussed parts of the drug transaction in an effort to determine who set them up with the police. SMITH admitted being in the area when MARTINEZ was arrested. SMITH stated that he conducted additional surveillance after MARTINEZ's arrest. SMITH stated that he observed several police cars in the area when she was arrested, but that they were all gone when SMITH returned to check the area. JONES stated that nobody knew about the color of the truck that Martinez was driving except "Marcus," who is one of their sources of supply from Texas. SMITH agreed. JONES stated that he knew somebody set them up with the police, and SMITH asked what they are going to do. JONES stated that they have to figure out how they can transport the drugs without getting

33

caught and that they need to get a shipment of drugs very soon.

62.     On May 26, 2012, at 2:18 p.m., SMITH (GTT2) called JONES (STT2). During this call, SMITH and JONES talked about "Marcus." SMITH told JONES that SMITH told Marcus that he was trying to get three (believed to refer to three kilograms of cocaine). JONES replied that's good, at least they (the Texas drug sources) "don't know then" (referring to knowing about the arrest of MARTINEZ with the last shipment of cocaine). SMITH stated that they are going to be getting the cocaine regardless of the problems they have been having. SMITH said that when they transport the cocaine (from Texas to Milwaukee), it should come back a whole different way. JONES agreed and talked about getting a car with a trap (concealed compartment) and that JONES would be getting plates for this car. JONES stated that "them plates gonna get us all the way through, gonna have to." JONES and SMITH then discussed transporting the drugs back on a bus or train. JONES stated that "Chase" (Devon Chase Cole) told him that all the "Mexicans" use the train to transport drugs because they know they will not get stopped by law enforcement on the train.

63.     On May 27, 2012, at 5:54 p.m., SMITH (GTT2) called William BANKSTON (414-870-7718). BANKSTON told SMITH that he is almost out (of cocaine) and BANKSTON is not giving any credit. SMITH told BANKSTON that he has to return the rental car (from the Texas trip).

64.     On May 27, 2012, at 6:31 p.m., SMITH (GTT2) received a call from JONES (STT2). During this call, SMITH and JONES talked about previous purchases of cocaine in Texas and discuss how the drug transactions occur. During the conversation, they again refer to two of the Texas drug suppliers as "Marcus" and "Lester." SMITH stated that he inspects the

34

cocaine and that Tiffany MARTINEZ brings the money. MARTINEZ then leaves with the cocaine. JONES stated, "you like, oh, Tiff gone, you said whoever, either Tiff or CHALUNDA, oh they gone," referring to a previous conversation with SMITH regarding at which point in the drug transactions that Tiffany MARTINEZ or CHALUNDA JONES would leave with the cocaine purchased from the Texas sources. JONES and SMITH indicated that they believe that the Texas sources may have set MARTINEZ up. They discussed the possibility of stealing cocaine from the Texas sources. During the conversation, JONES and SMITH indicated that this would be difficult to do because of the way the Texas drug suppliers conduct drug transactions and because the Texas suppliers are armed during these transactions.

65.     Shortly after this conversation, Steven JONES and Oliver JONES went to Texas to bring Tiffany MARTINEZ home, after Steven JONES posted her bail. On May 30, 2012, at 6:42 p.m., law enforcement officers from a Houston area drug interdiction unit conducted a traffic stop of Oliver JONES. Oliver JONES was stopped north of Houston.  He was in a vehicle with Anthony Paul and Curtis Stansberry.  During the traffic stop, Oliver JONES immediately exited the vehicle and approached the officer who pulled him over. Oliver JONES told the officer that someone was giving him bad information and that there was nothing in the car. Oliver JONES gave permission to search the vehicle. The vehicle was searched, but no drugs were located. Prior to the traffic stop, officers conducting surveillance observed Steven JONES and Tiffany MARTINEZ with Oliver JONES.  I know that members of the Steven JONES DTO use counter surveillance techniques and I believe that Oliver JONES was conducting a test run to see if the police would stop him.

66.     On May 28, 2012, at 1:29 p.m., SMITH (GTT2) called BANKSTON (414-870-

7718) and told him that he got in contact with a supplier named "Sam," but "Sam" is in Memphis. SMITH also told BANKSTON that he got some drugs the previous day. SMITH told BANKSTON that he got charged a high price for the drugs he got. BANKSTON stated that is how it has been, the people that have drugs have been charging a lot. BANKSTON asked SMITH how much he was charging and SMITH told him 13 ($1300 an ounce). SMITH told BANKSTON that he got it for 11 ($1100). SMITH told BANKSTON that it is selling even at that price. BANKSTON told SMITH that he wishes he had a brick (kilogram of cocaine) because it wouldn't last and hour. SMITH told him that he wouldn't last 5 minutes with him.

67.     On May 29, 2012, at 3:40 p.m., Dean ROUSE (414-419-4350) called SMITH (GTT2) and asked SMITH if he could get 3 (grams of cocaine) for a bill ($100). SMITH said no. At 5:33 p.m., ROUSE (414-419-4350) called SMITH (GTT2) and told SMITH that he is ready on Keefe (SMITH has residence near 67th and W Keefe Ave). SMITH told ROUSE to come around the back. ROUSE then told SMITH that he doesn't want to bring anyone near SMITH's house, and that he is riding with LA. Case agent believe SMITH initially rejected ROUSE's request, but then agreed to sell ROUSE and "LA" another amount of cocaine and the deal was to take place near SMITH's residence.

68.     On May 31, 2012 at 5:25 p.m., SMITH (GTT2) called BANKSTON (414-870-7718) and asked if found anything yet. BANKSTON told SMITH that he got an ounce from "Chuck" for 12 ($1200). SMITH asked BANKSTON what color was it (checking purity). BANKSTON said "Tanish yellow." They then talked about who they have been trying to get in contact with, Sam, but that Sam in not answering his phone. SMITH told BANKSTON to get him 2 (ounces) so he can make a quick $400- $500 pocket money. BANKSTON agreed to make

36

the order.

69. On May 31, 2012, at 5:35 p.m., Steven JONES used a new cell phone (STT3) to send a text message to SMITH (GTT2). JONES sent the message, "My new number 8323826046" to inform SMITH that JONES had obtained a new phone number. Similar to JONES changing his number after MARTINEZ's arrest, I believe that JONES changed his number because of the traffic stop of Oliver JONES. It should be noted that JONES used his new phone (STT3) to send this message to SMITH notifying him of the new number. Case agents verified that JONES was using STT3 by recognition of JONES' voice in the call referenced in paragraph 24 as well as numerous other calls between SMITH and JONES.

70. On June 1, 2012, at 2:43 p.m., BANKSTON (414-870-7718) called SMITH (GTT2) and told SMITH to get that bread (money) ready. SMITH asked who the money was for and BANKSTON responded "Chuck" (a source of supply). SMITH told BANKSTON that he has the money, but is at the barber shop. BANKSTON told SMITH that he will grab it (drugs) for SMITH and come where SMITH is. SMITH told BANKSTON to call him when it's (cocaine) in hand.

71. On June 2, 2012, at 5:22 p.m., SMITH (GTT2) received a call from JONES (STT3). During this call, JONES and SMITH talked about trying to obtain cocaine from various sources of supply or from subjects who "middle" cocaine purchases. JONES stated that he spoke with "Chase" (COLE) and that, "Chase and them said nothing happening and it wasn't no good" JONES further stated that he told Chase, "give me some of the mother fuckers that ain't no good just make the numbers right." I believe JONES was indicating that spoke to COLE and that COLE said the quality of the cocaine he could get was not good and that JONES would still buy

37

the cocaine if the price was low enough. JONES stated that Chase would "call his guy" (MEX) and call JONES back. JONES asked SMITH, "Did J-Rock ever say if old boy and them was straight down there?" and SMITH sated, "He texted me when he got back. He was straight." I believe SMITH was indicating that he spoke to his source and his source did have drugs. JONES also told SMITH that JONES just received a call from "T" who was, "talking about 37 cents." JONES is indicating that he also spoke with another source called "T" who was selling kilograms of cocaine for $37,000. JONES and SMITH also discussed which roads to take back from Texas when transporting drugs to avoid the police. JONES stated that he took the back roads. SMITH replied that they used to always take the back roads, but that JONES' GPS took them on the interstate. JONES replied that his new GPS doesn't take them on the interstate. JONES admitted that he made a trip back from Texas stating, "We didn't see no police or nothing... once you get out of there you smooth sailing." JONES said that he's going to have "Tiffany" (MARTINEZ) drive him around to see if she can talk to her guy down there because "Tiffany's guy is only paying 24-25" ($24-$25,000 per kilogram). JONES said "he could at least take 35" ($35,000 for a kilo). I believe Jones was telling SMITH that Tiffany has a drug source who is paying $25,000 per kilo and that he should be able to sell it to JONES for $35,000. SMITH and JONES surmised that Tiffany's guy only had one kilo left, and probably sold it to his friends. JONES said these guys don't talk about when they are getting a load of cocaine, and that they turn their phones off. JONES stated that everyone knows when they (JONES and SMITH) are leaving two weeks ahead of time. JONES also stated during the conversation that he received $15,000 from Jessica TALSKY, which he said he was going to use to purchase cocaine from COLE the day prior. JONES said "That bitch came in handy. She did not want to

38

give that money up." JONES stated Jessica TALSKY told him that she had $15,000 if he needed it, but did not think her little money would help so she didn't offer it. JONES stated that he "laid her down" and she came out of the room with the little box. JONES further stated in this conversation that he was mad that TALSKY gave someone else $12,000. (**LOCATION J**).

72.    A check of phone records revealed that JONES (STT3) made an outgoing call to 779-537-2316 (Rockford, Illinois, area code) on June 2, 2012, at 5:19 p.m. This call was one minute and 40 seconds long and was placed shortly before the above phone call (during which JONES talked about "Chase" (COLE) his cocaine source from Rockford, Illinois).

73.    On June 3, 2012 at 2:07 p.m., SMITH (GTT2) received an incoming call from JONES (STT3). During this call, SMITH asked JONES if he has heard anything and JONES replied, "hell no." JONES told SMITH "That shit is fucked up out here" (JONES indicated that he has not found a source for high quality cocaine). SMITH stated, "You checked the other out? it wasn't right huh?" JONES replied, "I already knew it was fucked up, but J, J wants 9, 9 of them" (J wants to buy nine ounces of cocaine from JONES). SMITH stated, "really?" and JONES replied, "His people do powder anyway, and Dean say his people do powder, they want a banana" (JONES is indicating that the cocaine is of poor quality and can only be sold to people who use the cocaine by snorting up their nose. JONES further indicated that Dean, believed to be Dean ROUSE, wanted to purchase a 4 ½ ounce quantity of cocaine from JONES). SMITH asked "How that shit look?" and JONES said, "Chalky" (JONES is indicating that the cocaine is of poor quality as good quality cocaine is shiny). JONES stated "Dean just tooted some and he said it good for tooters" (ROUSE is assisting JONES by testing the quality of the cocaine for JONES). JONES stated he is "waiting for J and them to pull up." SMITH told JONES, "I'll

39

probably get one" (ounce of cocaine). SMITH then asked JONES if he is at the "shizop" (the J-Spot) and JONES told him that he is "by Lil Jones" (indicating that he is at Oliver JONES place and that the drug customers are meeting Steven JONES there. Case Agents know that Oliver JONES resides at 2444 N. 15th Street, Milwaukee, WI (**LOCATION F**). JONES then begins to talk in a whisper and stated "You know what happened? They got three more and they got played dog." JONES asked SMITH to guess how much they paid for it, and SMITH replied, "How much?" JONES said "twenty-two-five." JONES stated they didn't think something had to be wrong with it and that, "they wasn't using their head" (JONES indicated that some individuals were buying the kilograms of cocaine for $22,500.00 each, and that they should have been suspicious that something may have been wrong). JONES stated that the man told him that, "he want a dollar a piece." JONES thinks that the price is too high and SMITH asked, "you keeping it?" JONES said "Come on now, I ain't gone keep it cuz I think they gone get back in, because they got 3 more, but what I gone tell them is I'm not gonna give them a dollar a piece. I might give them 8 a piece, cuz I got to get me a hundred off each one." JONES stated, "I'm just sell them all for 9, and just give him 8 a piece" and that "J getting ready to come through for 9, at a G a piece" (JONES is indicating that he wants to pay $800.00 per ounce and also that J is going to pay JONES $900.00 per ounce because J is selling ounces for $1000.00). JONES said "Dean say he gonna serve it to his people for 11" (selling ounces for $1100.00). SMITH then said" I'm gonna to call up my guys real quick" (SMITH is going to check with his customers).

74. On June 5, 2012, at 4:39 p.m., SMITH (GTT2) received a text message from JONES (STT3) which read, "Tone call lil j and said its cumn in today." SMITH sent a reply message back to JONES which read, "Cool i am ready." I know from other intercepted calls that

40

that Tone (real name unknown) supplies large quantities of cocaine and that JONES was letting SMITH know that he is expecting to be resupplied. I also know that SMITH has told customers that he has been out of drugs and has been waiting to get more.

75. On June 5, 2012, at 6:31 p.m., SMITH (GTT2) placed a call to JONES (STT3). During this call, JONES told SMITH that "he" (believed to be a drug source) called Lil-Joe (Oliver JONES) this morning at 8:30 and Oliver showed Steve JONES the phone. They state that they are both waiting (to be resupplied).

76. On June 6, 2012, at 11:49 a.m., SMITH (GTT2) placed an outgoing call to JONES (STT3). During this call SMITH asked JONES if he heard anything from his drug supplier. JONES replied that he was waiting on "Lil-Joe" (Oliver JONES) and that Tone never called JONES back. JONES also talked about another source of supply who JONES refers to as "that other guy," and that this source was talking "7" for sure. JONES also talked about a customer, "J," who buys ounces of cocaine from JONES. JONES stated he told "J" to come and get them for $750.00 "all day." JONES stated that he has to get back to the "shop" (the J-Spot restaurant) because the customer is on the way. (**LOCATIONS A & B**).

77. On June 9, 2012, at 10:26 a.m., SMITH (GTT2) received a call from JONES (STT3). In the call, JONES told SMITH that "Lil Jones" (Oliver JONES) just called and said that "Tone" called him. Steven JONES told SMITH that Oliver JONES wanted to know what SMITH wanted. Steven JONES told SMITH that Oliver only has "NiNi" (believed to refer to nine ounces of cocaine). JONES told SMITH that Oliver needs more stuff for himself but he said "what you want?" SMITH responded that he wanted "nine" (ounces) but otherwise will take half that. JONES then told SMITH that JONES was going to text Oliver real fast.

41

78.     On June 10, 2012, at 2:14 p.m., SMITH (GTT2) called JONES (STT3). During the call, JONES told SMITH was trying to text people to see what's happening (believed to be a reference to looking for more cocaine). JONES told SMITH he was tired of not having cocaine to sell.  JONES also told SMITH that the police had an area blocked off in the area of Keefe Avenue and Teutonia Avenue.  They discussed why the police may have that area blocked off. JONES told SMITH that he has been texting COLE. JONES said that he was going to call his cousin to see if he has any cocaine sources of supply.

79.     On June 13, 2012, case agents checked phone records for STT3 and observed that at approximately 1:12 p.m., STT3 was registering with a cell phone tower in the area of Rockford Illinois, where cocaine source Devon COLE resides. STT3 had a high volume of call activity with COLE's phone and with Oliver JONES' phone throughout the day.

80.     On June 14, 2012, at 5:39 p.m., BANKSTON (414-870-7718) called SMITH (GTT2) and told SMITH that he got some cocaine for 1350 ($1,350/ounce) as long as it's 3 (ounces) or better.  SMITH complained about the high price, and said he must be in one piece (making a better quality). BANKSTON said he would find out.  SMITH said to let him know.

81.     On June 14, 2012, at 7:33 p.m., BANKSTON (414-870-7718) called SMITH (GTT2) and told SMITH that he picked up some cocaine and that he grabbed SMITH one (ounce).  BANKSTON said "Yeah, you hoe it's chalky."  SMITH told BANKSTON that he needs to go get the money.  BANKSTON told SMITH to meet him at Tyrone's bar on North Ave once he does.

82.     On June 15, 2012, at 8:51 a.m., SMITH (GTT2) made an outgoing call to Steve JONES (STT3).  During the call, SMITH and JONES discussed various individuals they know

42

involved in selling cocaine, marijuana and heroin in Milwaukee, and the problems they are dealing with at this time. SMITH then asked about a specific individual known as "T-Zat" involved in heroin and JONES stated "He gonna give me three. He said they didn't have much but he's gonna let me work with that. Do they still have Dormin at the gas station on 30th and Lisbon?" SMITH then told JONES he could purchase Dormin at a different gas station. Case agents know Dormin is a sleep aid commonly used as a cutting agent by heroin distributors to increase the amount of product they have to sell. Based upon calls intercepted in the last three weeks, case agents know the JONES DTO is having difficulty obtaining cocaine on a regular basis. JONES, therefore, is turning to heroin to make money.

83.  On June 15, 2012, at 11:58 a.m., BANKSTON (414-870-7718) called SMITH (GTT2) and asked SMITH if he wanted some more (cocaine) or is he alright. SMITH told him he wants more but the price needs to be lowered. BANKSTON told SMITH that it was 14 ($1400 an ounce) but if you get 2 or 3 it $1350. BANKSTON said he is going to get more. SMITH asked when, and BANKSTON replied as soon as possible. SMITH said he will call BANKSTON back.

84.  Based on court-authorized monitoring of GTT2 and STT3, as well as other law enforcement investigation, case agents determined that in late June and into the first weeks of July 2012, JONES, SMITH, and other members of the DTO experienced difficulty in obtaining large amounts of cocaine from their normal suppliers to sell to their normal customers. JONES, SMITH, and other members of the DTO frequently referred to the lack of cocaine as a drought. Since late June 2012, JONES spent a considerable amount of time looking for new sources of cocaine and sources for other controlled substances, including: heroin, marijuana, and

prescription pills. JONES did obtain small amounts of cocaine to sell, but it was poor in quality which limited the individuals who would buy and sell it.

85.     On June 26, 2012, beginning at 12:53:55 p.m., and continuing until 1:05:53 p.m., Jermaine KIRK and JONES (STT3) exchanged a series of texts concerning whether JONES had drugs available for sale.  KIRK initially texted JONES "U still got some of that funny stuff." JONES replied "YEA," followed by "VickO" from KIRK.  JONES then asked "Wen," KIRK responded "20min," which was followed by "k" from JONES.  Case agents believe that in the above series of texts, KIRK asked JONES for 7 grams of cocaine and arranged a time to meet. Case agents know that "Vick and or VickO refers to NFL star Michael Vick, who wears No. 7 on his uniform. Case agents also know from the investigation to date that KIRK is one of JONES' regular cocaine customers.

86.     At 1:20 p.m., JONES (STT3) received an incoming call from Nicole TALSKY at (414) 324-2448.  During the call, N. TALSKY told JONES she wanted to buy cocaine from JONES and she had a customer already lined up.  JONES informed her that he had some left but that "it's for tooters, and that he can't cook it and it's not all that good…and let him decide what he want to do."  Case agents believe JONES was explaining to N. TALSKY that the cocaine he had available could only be snorted, and could not be converted into crack cocaine (because the purity level was too low, and during the cooking process the overall weight would decrease dramatically).

87.     On June 26, 2012, at 8:16 p.m., JONES (STT3) received a call from Tommie Lee HARRIS, a.k.a. "Junior" (414-519-2260). During this conversation, JONES states that "Leothus nem came down here, man talking about man they talking about it came from you"(referring to

44

JONES). JONES stated they couldn't have told you know "shit" like that. HARRIS stated that they were lying and that he and "Ink" were there. JONES stated that he told the guy he didn't know what they were talking about and, "Low said Steve, me and you go way back, man. Just tell him to straighten man, we all good, this and that this and that. I said man, I don't know what happened. I don't know what's going on. I said I will try to call them for you. That's all I know." HARRIS stated that was my guy "T" and that JONES should know that it "ain't no motherfucking shit" (indicating that JONES knows "T" and knows that "T" wouldn't sell bad dope). JONES stated, "Leothus gonna leave it with me, talking about Steve just hold on to it. I said I don't want to hold on to it. He said man just hold on to it man just see if they gone straightened it out. I'll just come back and pick it up. I said you might as well take it with you because I ain't talk to none of 'em, so.." HARRIS stated that this is how I received it and I would make a "motherfucker right" and that the "nigga" just called and said I left it with your cousin. JONES replied, "How do they know we was kin", and HARRIS stated, "Fuckem them. We'll give you a call." Case agents believe that a drug deal took place involving HARRIS and because of HARRIS's association with JONES, people assumed that JONES was involved in the drug deal and came to JONES to have him correct the problem.

88.    On June 26, 2012, at 8:30 p.m., JONES (STT3) called HARRIS (414-519-2260). During this call, JONES stated, "I don't want no bullshit going on here because you ass whooped those niggas in front of the shop." HARRIS stated that he didn't know them "niggas light weight." JONES, who referred to HARRIS as "Junior," stated "I know Low and them didn't give you shit (bad drugs)." JONES stated that they need to "holler at T-Bone and Pito." JONES and HARRIS then then talked about what the guys looked like and JONES stated that "Low" is a

45

now a drug addict and that he is trying to use his previous reputation by pretending the dope is his. HARRIS stated, "Man fuck that nigga. We right here if you need us to come through there." JONES stated, "I'll call you if I need you. Low didn't give you shit." HARRIS replied that it was the skinny guy. JONES stated, "He said you hollered at him through Mo, nobody fucks (gets drugs) with Mo no more." They then talked about how the money was exchanged and JONES stated, "I'll call, I'll call y'all. In the meantime ya'll, ya'll just gone and chill. I'll let ya'll know." HARRIS replied, "Okay, just give us a call" (indicating that if there is any trouble stemming from a drug dispute that HARRIS and his associates will aid and assist JONES, including using physical violence). (**LOCATIONS A & B**).

89.　　At 9:19:03 p.m., JONES (STT3) sent Devon Chase COLE (799-500-9392) a text that read ""Wat our mex say." At 10:03:58 p.m., COLE responded with "Dont kn i aint called n 2days he will call." Case agents believe JONES was contacting COLE to check on the status as to whether COLE's Mexican source had any cocaine available, to which COLE said the source will call COLE when he has cocaine available.

90.　　On June 27, 2012, at 2:38 p.m., BANKSTON (414-870-7718) called SMITH (GTT2) and asked if SMITH talked to him yet (SMITH's source of supply). SMITH told BANKSTON that he has, that the supplier has cocaine, and the supplier will be with SMITH. SMITH told BANKSTON that he has to get some too.

91.　　On June 27, 2012, at 05:35:50 p.m., case agents intercepted SMITH (GTT2) talking with "Cal" (262-327-1388). During the conversation, "Cal" told SMITH that he was, "seeing if your ass got lucky." SMITH replied, "I told you I been right" (that he has drugs). Cal told SMITH, "I need another one", and SMITH stated, "you gotta come grab it." Cal asked, "Can

46

I get that whole whatchamacallit too?", and SMITH said, "Yea." Cal then told SMITH that he needs a few minutes.

92.     On June 27, 2012, at 5:54 p.m., JONES (STT3) called Jessica TALSKY at (414) 610-1838. The contents of the call suggested JONES had supplied J. TALSKY with heroin, which she in turn had supplied to customers.  JONES asked J. TALSKY what the customers' reaction was to the heroin.  J. TALSKY stated "it smells like vinegar…and like, it tastes like vinegar.  And I'm like, yeah, that's a good sign."  Case agents know heroin typically has the smell of vinegar.  JONES was pleased and said he still had "fourteen fifteen grizzles, though." J. TALSKY then suggested JONES sell it all to a single individual, saying "If you sell them to Chris for bill 30 you know you could get rid of all of it at once" (sell the heroin for $130.00 a gram).  JONES stated he would sell it for that price.  Case agents believe JONES had fourteen or fifteen grams of heroin left to sell, and J. TALSKY suggested that JONES sell those grams to an unidentified female known only as "Chris" for $130 per gram. (**LOCATION J**).

93.     On June 28, 2012, at 10:27 a.m., JONES (STT3) called Devon Chase COLE at (779) 500-9392.  During the call they discussed the difficulty everyone seems to be having trying to obtain cocaine.  COLE told JONES he was considering coming to Milwaukee to purchase "dog food" (commonly used code for heroin) from JONES.  JONES stated he had source of supply who had recently offered him a good deal.  "I got this, ah, this ah, Mexican man…he talking about he can give me a whole thing for 70…Man, once you get your clientele with that, that shit better than the other dope, that other shit."  Case agents believe JONES was saying he could purchase a kilogram of heroin from his source for $70,000, and that he could actually make more money selling heroin than cocaine.  However, later in the conversation, JONES went

47

on to say he didn't want the high foot-traffic coming to the J-Spot so he declined to purchase the kilogram. (**LOCATIONS A & B**).

94.     On June 28, 2012, at 3:22:48 p.m., case agents intercepted SMITH (GTT2) talking with "Cal" who was using telephone number 262-327-1388 "Cal" and Cal said he wants to come "holler" at SMITH. SMITH said, "Uh, yea, wait until I leave my storage really quick." Cal asked how long and Gek said 30 minutes. Cal said that is long enough for him to do what he has to do.  Case Agents know that SMITH has two storage lockers located at A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, Wisconsin, Unit Numbers E-09 and E-10 (**LOCATIONS G & H**).

95.     On June 29, 2012, at 8:09 a.m., JONES (STT3) and J. TALSKY had a discussion regarding J. TALSKY aiding FNU LNU, a.k.a. "Joe," in obtaining a fraudulent prescription. J. TALSKY told JONES that "Joe" would need $160 to get the prescription, and asked JONES to confirm that she will be going with "Joe."   JONES then placed J. TALSKY on hold and called "Joe" at (414) 202-2580 (used by George Joseph LANDRATH, a.k.a. "Joe").   During this conversation, "Joe" said that he had to "Pick up the damn script. So I'll go to the doctor.  And then he writes it out.  When he's done writing it out he calls us.  I told her (J. TALSKY), I said he call us.  Meet us at the pharmacy."   Case agents believe these calls indicate JONES was trying to obtain prescription pills to distribute through J. TALSKY and "Joe." (**LOCATION J**).

96.     On June 30, 2012, at 11:32:27 a.m., COLE (779-500-9293) called JONES (STT3).  During the 19 minute call, JONES and COLE talked about COLE's source (MEX) and other drug trafficking activities.  COLE said he called "dude" and "dude said it was supposed to be yesterday, but now dude want us to haul for him" (transport drugs).  JONES said he was

48

"ready to roll out." COLE said the source said "I'll have something coming in the next two days though." JONES asked COLE if it was just talk. COLE said the source "be pretty straight forward with me and he ain't no liar anyway, that's why I fucked (got drugs from) with him, he's similar to myself, he's similar to us put it that way. If he knew something he would say." JONES said he had to step outside cause people were listening. They then continued to talk for several minutes about alternative sources of supply. They ended the call by agreeing to contact one another with any news about dope being available. Telephone records indicate that 815-209-3348 (MEX) called COLE at 11:30 a.m. on June 30, a call that lasted for about 40 seconds. The records also show that COLE called MEX at 11:31 a.m. on June 30, a call that lasted for about 63 seconds.

97.    On July 1, 2012, at 6:14 p.m., JONES (STT3) received an incoming text message from Devon Chase COLE (779-500-9293) which stated "Shit made it too Chicago." Case agents believe this text message indicated a shipment of cocaine had arrived in Chicago, IL and served to alert JONES to that fact. Telephone records indicate that COLE contacted 815-209-3348 (MEX) three time during the late morning of July 1, 2012.

98.    On July 1, 2012, at 6:21:36 p.m., Oliver JONES (414-610-1714) called JONES (STT3) and the two began to discuss cocaine prices they were charging people. JONES told Oliver (JONES) that his "number" (price) was going to be his "number no matter what it was" and that Gek (SMITH) wasn't going to move it faster than JONES. Oliver JONES then began talking about a third party saying JONES sold his for "13 cents apiece ($1,300 per ounce), but could've sold them for at least 14 a pop ($1,400)." JONES sounded upset and said "You wanted what you wanted and you got what you got." OLIVER said the third party said JONES made

49

$5,200 plus $300 off of each one (ounce of cocaine). JONES was upset because the third party said JONES "cuffed." The money JONES made is his profit. OLIVER then said he has a whole one (ounce of cocaine) and is bagging the rest of them up in "doves (possibly "dubbs"- twenty dollar quantities of cocaine)." JONES and OLIVER then talked about how nobody is outside because it's hot out. JONES said he called COLE and told him that he has to know somebody (cocaine supplier). JONES stated that COLE said "Mex" or "Max" knows some people but he doesn't trust them. JONES stated that COLE said Max/Mex only does business with close friends and family members now. OLIVER said Max/Mex won't reveal his sources of supply.

99.     On July 2, 2012 at 1:02 p.m., case agents intercepted Getharia SMITH (GTT2) talking with William BANKSTON who was using telephone number 414-870-7718. During the conversation BANKSTON stated that he is at a drug user's house right now and when he opened it, "it was yellow too" (good quality cocaine base). BANKSTON stated, "I'm fixing to go get 3 or 4 of them. How many you want, about 3?" and SMITH replied, "Yea." SMITH told BANKSON that he is at the shop. (**LOCATION E**). BANKSTON asked SMITH, "You got the money on you or do you gotta go to the house?" and SMITH replied, "I gotta run to the house." Case Agents know that SMITH resides at 3427 N. 67th Street, Milwaukee, Wisconsin (**LOCATION D**). BANKSTON told SMITH to "go to the house and get it," and to call him as soon as he gets it because BANKSTON is going to call and tell him to "bring it" right now. SMITH told BANKSTON to "make that four," and BANKSON said, "four? OK, alright." Case agents believe that BANKSTON is about to purchase 3-4 ounces of cocaine for himself and another four ounces for SMITH. SMITH indicated that he has to go to his house to get the money needed to purchase the cocaine.

50

100.    On July 2, 2012, at 9:50 p.m., case agents intercepted Getharia SMITH (GTT2) talking with unknown male who was using telephone number 414-627-2164 (subscribed to Javod PETTY). During this conversation, UM stated, "I need three, two and one" and SMITH asked what he means by 2 and 1. UM stated, "I want a seven and a three point five." SMITH told him, "You gotta come get it now, cause I gotta go get my wife." UM said, "OK, you at the house, right?" SMITH replied, "yep." UM said he is on the way. Case agents believe that UM is purchasing a 7 gram (quarter ounce) quantity and a 3.5 gram (one-eighth ounce) quantity of cocaine from SMITH and he is going to meet SMITH at SMITH's house.  Case Agents know that SMITH resides at 3427 N. 67th Street, Milwaukee, Wisconsin (**LOCATION E**).

101.    On July 4, 2012, at 11:17:16 a.m., JONES (STT3) had contact with COLE. During the 28 minute conversation, the two talked about their source of supply (MEX) and the current scarcity of cocaine.  JONES told COLE he was mad at Lil Jones (OLIVER) and Gek (SMITH) because they have been getting drugs and not telling him about it.  JONES said he saw one of his people, Mari (Marisol Cruz, a long-time JONES customer), leaving from around Lil Jones house.  COLE said "He (OLIVER) go somewhere else (supplier) and grab something (drugs) and then use your people" (JONES' customers).  COLE said "I would charge his mother fuckin ass" (make OLIVER pay a fee to JONES).  JONES said he is "going to do him (Oliver) like I did the last time when I got them 2 (kilograms)…he didn't even know I got 1 (kilogram). JONES said he knows how to get them (OLIVER and SMITH) back.  He is going to get all his people back and have them call his phone (STT3).  COLE then said "this shit better not come today, out of all days" (referring to cocaine from COLE's supplier, MEX).  JONES said "It's gonna come when you least expect it. It gotta be close. Something gotta be ready to happen,

51

cause too many people up here got it" (referring to the source in Chicago obtaining cocaine soon because people in Milwaukee have cocaine). COLE and JONES then discussed how "MEX" knows a lot of people. They talked about how "MEX" keeps a low profile and how "MEX's" brother got caught with 5 bricks (5 kilograms of cocaine) and took the case for "MEX." JONES talked about how OLIVER is using JONES's truck and that the license plate on it was stolen and OLIVER didn't tell JONES. JONES then said that when OLIVER lost $20,000 when JONES was working on the shop (J-Spot), JONES "didn't fuck with Lil Jones (OLIVER) for 2 months." COLE said that JONES gave Lil Jones "too much power and he couldn't handle it." He said Lil Jones probably "tricked off the money with the hoes." JONES said that he was hearing from people from Indiana that Lil Jones was trying to open a club in Indiana behind JONES's back. JONES said he called Lil Jones and confronted him about the fact that he was using JONES's money. JONES said "That's when I cut his water" (drug supply). JONES said that Lil-Joe (Oliver JONES) was taking "seven zips" (ounces of cocaine) to Sheboygan. COLE said that JONES "better listen to your wife, because Lil Jones gonna try to take him off one day." JONES said that "He (OLIVER) did, in '98. Lil Jones got in the car dirty and nobody knew. Then he was like take me to the house. When I got there the police sitting there waiting, like what's your name." COLE asked "How long a run you had before that arrest?" JONES said "I had a sweet. I had so much." JONES went on to list the cars that he had in 1998 and how they were all brand new and paid for. JONES said he was paying "18 a pop" ($18,000 per kilogram) and it was a "drought." JONES said he "had a nasty plug and they wanted to kill Gek (SMITH)." JONES said that he has "never been caught red handed with nothing" and that every time he "went to jail it's because somebody told or another muther fucka got caught and said it was mine. And Gek

52

(SMITH) was the mutha fucka that told with the Feds. I still got the tape at home buried. The tape where they were interviewing Gek." JONES said his attorney has a copy too. JONES and COLE continued to talk about how Lil Jones (OLIVER) messes up JONES's business in Milwaukee. JONES eventually ended the call by stating "Call me when Mex call. I'm on my way. Just hit me up when something happens, I'm a sit here and lick my wounds.

102. On July 5, 2012, at 9:48 p.m., JONES (STT3) received an incoming call from FNU LNU, a.k.a. "Kool Aid," at (414) 306-3774. During this call Kool Aid introduced JONES to a possible new cocaine source of supply known as "Puerto Rican Kevin," (hereinafter referred to as PRK) who identified himself as an over the road 18-wheel truck driver. Using Kool Aid's cellular telephone, PRK told JONES "over there in the West Coast, over there I got a buddy of mine sitting on the boxes...you know of shrimp...you know the shrimp boxes...they 22 dollars a box...22 dollars a box all day long." Case agents believe PRK is offering to supply JONES with kilograms of cocaine for $22,000 per kilogram which PRK would transport from the West Coast, in all likelihood California. PRK eventually suggested that he, Kool Aid, and JONES meet the following day around lunch time to further discuss working together.

103. On July 6, 2012, at approximately 2:10 p.m., JONES (STT3) made an outgoing call to Kool Aid at (414) 306-3774. They agreed to meet at the McDonald's which is located on N. 27th Street (and W. Capitol). Surveillance observed JONES, Kool-Aid and PRK meet at the McDonald's located on N. 27th Street in Milwaukee where case agents believe they discussed a future cocaine transaction.

104. Soon after the meeting with Kool-Aid and PRK ended, at 3:00 p.m., JONES (STT3) contacted an unknown female at (414) 940-3734 to discuss the price of heroin. The UF

53

asked what JONES could do for $500, and JONES stated he could supply four grams. The UF wanted more heroin or a better price but JONES refused, saying he needed to make a profit and it was difficult to get a hold of heroin as well as cocaine. The UF agreed, saying "nothing's around nowhere so everybody's going to that." JONES stated "I know that…four to five people came to me today even with the Perc 30's." Case agents believe JONES was lamenting the shortage of controlled substances available to sell and was referring to Percocet 30 mg pills, which case agents are aware that heroin addicts occasionally use as an alternative when they are unable to obtain heroin.

105.    On July 9, 2012, at 8:11:50 p.m., COLE (799-500-9392) called JONES (STT3) to tell JONES that "dude (their source, MEX) just called and said he turned stuff down because of the numbers are too high and the quality…said it's real bad, so he ain't gonna do it." JONES replied that "He turned it down because he probably wasn't making nothing." COLE stated "That's what he said…That his guy won't be able to do nothin." JONES asked "What he say, what he say, he didn't say what they was charging?" COLE said "I know it's ridiculous when one of my guys just got hit $1350 on 28th Street" ($1350 for one ounce of cocaine). JONES replied "That is what people are paying in Milwaukee." COLE said "He (MEX) gone call you in a minute though." JONES said "I knew they probably would call me. Motherfuckers were just too high" (JONES referring to other drug sources). COLE asked "How you feel if somebody say they gone do something for you and they don't it?" JONES then said "It's kind of fucked up." A check of phone records revealed that COLE (799-500-9392) received an incoming call from 815-209-3348 (believed to be COLE's source of supply known as MEX) at 8:06:00 p.m. (a short time before the above call with JONES). At 8:17:55 p.m., JONES (STT3) sent COLE at text message

54

that read "Y don t u ask mex Wat they charging."

106.    On July 10, 2012, at 12:11 p.m., JONES (STT3) called Tommie Lee HARRIS

(Junior) (414-519-2260).  During this conversation, HARRIS stated that he told her that he wants

one. HARRIS wanted to know if he could pick up a JONES drug associate who HARRIS refers

to as "old dude Tone" (believed to be Anthony PAUL). HARRIS wanted to get "Tone" so he

"can try it out" (test the quality of the drugs). JONES asked if, "it's already done" (cooked into

cocaine base).  HARRIS stated "It's done." JONES stated that "Tony can try it out," and that

Tony can tell if it's good by looking at it (Tony doesn't have to use the cocaine base, he can tell

if it is good just by examining it). JONES wanted to know if the niece could get one in "powder"

(cocaine salt). HARRIS stated that he can tell her and that he can see if she can get it in that

(powder cocaine). JONES asked, "What are they talking about regarding the numbers (the price

of the cocaine)?"  HARRIS stated, "12" (indicated that it is $1200.00 for an ounce of cocaine).

JONES stated that he was going to get one just to do some "dubs" ($20.00 quantities of cocaine).

HARRIS stated that he would call the niece back and see if she can get it.

107.    On July 10, 2012, at 12:15 p.m., JONES (STT3) had a discussion with "Junior" at

(414) 610-1838.  This is Jessica TALSKY's number and Junior apparently borrowed the phone

from J. TALSKY.  During previous calls directly with Junior at 414-519-2260, Junior had

offered to connect JONES with an unknown female family member in Waukegan, IL who had

cocaine for sale.  In this follow-up call, Junior stated the UF had only crack cocaine for sale,

which worried JONES because "I just don't want to get something with that all soda…You can

put a lot of soda in hard…I had done it before…I know how to do it." Case agents believe that

JONES was worried the new source would put too much baking soda into the mix when she was

55

converting the cocaine HCL into crack cocaine. JONES went on to instruct Junior how he can check the quality of the crack cocaine by crumbling it in his hand. JONES also told Junior he will give him $6000 to take with him to purchase the crack cocaine if it looked to be of good quality. Case agents later identified "Junior" as Tommie Lee HARRIS (DOB: 3/11/72).

108. On July 10, 2012, at 1:25 p.m., BANKSTON (414-870-7718) called SMITH (GTT2) and SMITH told BANKSTON he is waiting on a call from a supplier. BANKSTON asked SMITH if he wants money (for BANKSTON's order of cocaine) and SMITH told him to wait. BANKSTON told SMITH that he is going to bingo and he will leave the money at his house. BANKSTON told SMITH that he can get money from his girl if needed. BANKSTON asked how much (price of the cocaine) and SMITH told him 13 ($1300) an ounce.

109. On July 10, 2012, at 1:41 p.m., BANKSTON (414-870-7718) called SMITH (GTT2) and told SMITH he wants 5 (ounces). SMITH told BANKSTON he doesn't want BANKSTON to cut into his (SMITH's supply of cocaine). SMITH said he was going to get 9 (ounces) and BANKSTON stated to get him 5 (ounces) if he (supplier) has it.

110. Later on July 10, 2012, at 7:08 p.m., JONES (STT3) contacted Carlos Cervantes, a.k.a. "Maestro," at (414) 324-2827. JONES had previously asked Cervantes (via text) if he had heard anything yet (in regards to the availability of cocaine). In this call, Cervantes stated he had talked with his source of supply and was told "they got the one that is the 65 percent. And I told him no, man, we get in trouble already with that. We don't want to see that nothing man." JONES asked "How much was they talking about that though?" Cervantes replied "Twenty… twenty seven I think." Case agents believe Cervantes was saying that his source can only provide poorer quality cocaine (with a purity of 65% rather than 100%) for $27,000 per

56

kilogram, which Cervantes did not want to supply to JONES.

111.　On July 11, 2012, at 5:09:36 p.m., OLIVER Jones (414-610-1714) called JONES (STT3).  During the conversation, OLIVER said he was in Chicago with "Snap" at the "Taste of Chicago."  Steve: "You said Ted's people got it up there?"  OLIVER: yeah, yeah.  Steve: So they ready right now.  OLIVER: You just said I can call and get all the right information.

112.　At 5:22:48 p.m., OLIVER Jones (414-610-1714) called JONES (STT3).  During the conversation, JONES said Gek (SMITH) keeps calling him, but he (JONES) isn't answering any of Gek's calls.  JONES said this is why Chase's (COLE) guy (MEX) was saying for sure for sure.  OLIVER said he asked UM (b/t/b/ Ted) if he "seen it with the white of your eyes."  OLIVER told JONES that UM (Ted) said "'man, shit...That shit right there.'"  OLIVER asked about the number they were putting on them (price per kilogram).  JONES said "What everyone is charging."  OLIVER asked "Trey-six" ($36,000 per kilograms).  JONES said that is what COLE charges too.  JONES said that he doesn't want to drive up there (Rockford) and he has to wait for people.  OLIVER agreed and said that he's going to go and look (at the product) when they say it's there.  JONES said he not going to go there (Rockford) and have the people (COLE) say dude (MEX) didn't come or they didn't unload. OLIVER asked how is JONES going to do that and said "They aren't going to move until you (JONES) gets there."  JONES said he is going to make sure it's there because he doesn't want to go on someone (COLE) saying that my guy (MEX) said it was there and it really hasn't been seen.  JONES then yelled to "Snap" (believed to be in the background on OLIVER's side of the conversation) and asked "You going to get something."  Jones then told OLIVER to call him when OLIVER gets a call back (from the source).

57

113.     At 6:14:38 p.m., COLE sent JONES (STT3) a text which read "Shit made it too Chicago."  A check of phone records indicates that on July 11, 2012, at 4:30:46 p.m., COLE (779-500-9392) received a text message from 815-209-3348 (MEX).  At 6:24 p.m. and 6:25 p.m., COLE called 815-209-3348 (MEX).  Telephone records further indicate 815-209-3348 (MEX) did not leave the Rockford, IL area on July 11 02 12, 2012.

114.     At 6:26:54 p.m., OLIVER JONES (414-610-1714) called JONES (STT3) and said that "Meechie and John John got arrested.  OLIVER said "The police are out on 35th and Center (2672 N 35th) and have them cuffed. Police done pulled the seats out to the vehicle. Regular police searched the car and 5 detect cars pulled up and took them on down."  JONES said "Meechie was just in there talking about pistols...Yeah man, I had to up on these niggas...I had JJ up on these niggas."  JONES told OLIVER that COLE called JONES and said "for sure" and JONES could come tonight or tomorrow.  JONES told COLE that it will be tomorrow.  JONES was then heard yelling at Nicole (TALSKY) and told her to stop following him because he is trying to talk to Lil Jones (OLIVER).  JONES said he told COLE "if it's not too late and whenever he (MEX) get finishing doing what he's doing he (JONES) will come tonight to grab it."  JONES also told OLIVER that he ordered a pager (STT4).

115.     At 6:27:40 p.m., COLE (799-500-8392) called JONES (STT3) and the two discussed an incoming shipment (of cocaine).  COLE: "When he (MEX) say for sure, it's for sure.  He said call your uncle (JONES)."  JONES: "You want to know how I know he ain't lying...because I just text him…he's up in Chicago right now."  COLE: "Ah for real?"  JONES: "Yup. Little Joe (OLIVER) going over there right now.  He just told me."  COLE: "I told you he must knew something then you know...knew something."     JONES: "So you ask him...ask

58

him...ask him ...he don't know when, huh?" COLE: "Ah, he just saying call your uncle (JONES) tell him tomorrow for sure." JONES: "Little Jones talking about come over and all that I'm not messing with them other people man." COLE: "Yeah." JONES: "Straight up. I'm waiting on Mac (MEX). You know what I'm saying?" COLE: "Hell yeah." JONES: "Well I'll be ready bright and early if something..." COLE: I just got off work. A check of phone records revealed that at 6:24:01 p.m. and 6:25:29 p.m., COLE received two calls from 815-209-3348 (MEX).

116.     On July 12, 2012, at 8:07 a.m., JONES (STT3) contacted COLE (779-500-9392) and JONES asked COLE, "did he (MEX) give us a time frame?" and COLE stated, "No he didn't give us no time frame." JONES told COLE, "I was gonna come that way last night..." COLE stated, "Spend the night, huh?" JONES replied "Yup, Come there last night and drop it off." COLE stated, "Let me call him real quick." Case agents know from previously intercepted calls that JONES has been having trouble obtaining large quantities of cocaine and believe that JONES is calling COLE and asking him to call his cocaine source of supply to obtain more cocaine for JONES. JONES is so anxious to get cocaine from COLE that he wanted to go down to Rockford Illinois (where COLE lives) the night before to drop the money for the drugs. COLE told JONES he will call his source. A check of phone records revealed that on July 12, 2012, at 8:08:46a.m., COLE (779-500-9392) called 815-209-3348 (MEX).

117.     At 8:12 a.m., COLE called JONES (STT3) and asked "How many overtimes you need." JONES stated "two." COLE stated "alright." Case agents believe "Overtimes" is code for kilograms of cocaine. At 8:17:13a.m., COLE received a call from 815-209-3348 (MEX).

118.     On July 12, 2012 from approximately 2:15 p.m. to 2:23 p.m., JONES (STT3) exchanged a series of text messages with Tommie Lee HARRIS (414-519-2260). At 2:15 p.m.,

59

HARRIS sent a text which read, "Can I ride down on u I ll send my girl." JONES sent a text back which read, "Wat they talking." HARRIS returned a text which read, "Half" (half ounce). JONES sent a text which read, "H or s" (hard or soft cocaine). HARRIS sent two texts back which both read, "Solid." JONES then sent a text which read, "For u didn t lil j hit u." (JONES doesn't want HARRIS to let Lil J, believed to be Oliver JONES, know that HARRIS is getting cocaine from JONES). HARRIS sent a text back to JONES which read, "No" (HARRIS confirmed that he will keep the drug transaction confidential).

119.    Throughout the day on July 12, JONES (STT3) and COLE exchanged text messages and calls about when the cocaine would be available and when JONES should leave Milwaukee for Rockford to obtain the cocaine. COLE told JONES not to come until COLE told him to do so. At 8:32 p.m., COLE contacted JONES (STT3) to say "he just called me and said you can come on. He said $700 more. I don't know if he talking for like each one or both of 'em" (the two kilograms of cocaine). JONES agreed to go to Rockford, IL. A check of phone records revealed that at 8:29:14 p.m., COLE made an outgoing call to 815-209-3348 (MEX).

120.    Following the above call between COLE and JONES (STT3), and prior to JONES' arrival in Rockford, case agents established surveillance of 216 Adams Street, Rockford, IL, the residence of Devon Chase COLE. At approximately 10:35 p.m., case agents observed JONES, who was driving his gray full-sized Chevrolet van bearing WI plate JG9956, park in the vicinity of 216 Adams Street, Rockford, Illinois. Case agents observed JONES exit the van and meet up with COLE in the vicinity of the residence. COLE and JONES both then entered a white van and departed the area. About 30 minutes later, COLE and JONES returned to 216 Adams Street in the white van. JONES then got into the gray Chevy van and drove away.

60

121.    As JONES drove northbound on the return trip to Milwaukee, WI, COLE checked on JONES' status via a text message to JONES (STT3), and JONES reassured COLE that he was okay. At about 11:15 p.m., case agents established surveillance on the J-Spot Restaurant, 3872 N. Teutonia Avenue, Milwaukee, WI. (**LOCATIONS A & B**).

122.    On July 13, 2012, at 12:32 a.m., COLE again checked on JONES' status via a text message to JONES (STT3) as JONES returned to Milwaukee transporting the suspected two kilograms of cocaine. At 12:33 a.m., JONES (STT3) answered COLE via text a message stating "Yea 10 min I gd."  Case agents believe this text indicated that JONES and the cocaine were alright and would be arriving in Milwaukee in about 10 minutes.  At about 12:44 a.m., case agents observed the gray Chevy van bearing WI plate JG9956 pull up to the rear of the J-Spot Restaurant.  JONES exited the van, walked around the front of the vehicle, unlocked and opened the gate, returned to the vehicle, and pulled into the driveway.  Case agents then observed JONES close the gate and secure it behind him before walking southbound on N. 20th Street out of sight. (**LOCATIONS A & B**).  Approximately 25 minutes later, at 1:10 a.m., JONES (STT3) sent out a text to seven individuals (presumed customers) which stated simply "Tomorrow." After one customer replied for prices via a text message to JONES (STT3), JONES again sent out a mass text message that read "175/350/650/1300."  Case agents believe this last text message was a price list for an eighth of an ounce ($175), a quarter ounce ($350)), a half ounce ($650) and one ounce ($1,300) of cocaine and/or crack cocaine.

123.    On July 13, 2012, at 10:50 a.m., case agents set up surveillance at the J-Spot in anticipation of JONES distributing the cocaine he received from MEX through COLE the night before.  At 10:55 a.m., monitored conversations of JONES over STT3 indicated that a number of

61

individuals were at the J-Spot to pick up drugs. JONES was telling parties told hold off as he was not ready yet. At approximately 11:20 a.m., monitored telephone conversations of JONES over STT3 indicated that the case agents' vehicle had been spotted in the area of the J-Spot and JONES stopped distributing temporarily. Monitoring later in the day revealed that JONES began distributing again at the J-Spot. Several calls indicated that JONES was using NICOLE TALSKY at the counter to send customers up to the apartment above the restaurant, as well as sell lesser amounts of cocaine at the cash register in the restaurant. (**LOCATIONS A & B**). Court-authorized monitoring of STT3 and surveillance indicated that throughout July 13 & 14, 2012, JONES (STT3) distributed most of the cocaine to his customers via text messaging and short calls. The following summaries are example of those calls and text messages:

- On July 13, 2012, JONES (STT3) and an individual known only as Juan ORTIZ at (414) 940-3734 exchanged a series of text messages beginning at 5:47 p.m. JONES texted: Wat u need. ORTIZ responded: only a half now. After a 25 minute wait, ORTIZ texted: Now 15 min. K? JONES responded: K txt wen close 650. Based upon the on-going T-III and general knowledge of the JONES DTO, case agents believe JONES is supplying ORTIZ with a half-ounce of cocaine for $650.

- On July 13, JONES (STT3) placed and received a series of text messages with "J" (414-687-5639), which case agents believe resulted in multiple crack cocaine transactions between the two. For example, at 9:49 a.m., "J" sent JONES (STT3) a text stating: Walking down 28th street twice. JONES replied: Ill text u n min. Case agents believe "J" was ordering two ounces (28 grams a piece) of crack cocaine and that JONES was still converting the cocaine powder into cocaine base (crack) and planned on texting "J" when the process is complete.

- On July 13, at 10:10 a.m., ROUSE (414-419-4350) called JONES (STT6). JONES told ROUSE that he is not ready yet. ROUSE said he wants 2 (ounces of cocaine). JONES told ROUSE to come through the back and come upstairs. (**LOCATIONS A & B**).

- On July 13, 2012, JONES (STT3) and COLE (779-500-9392) exchanged a series of text messages and calls during which they discussed the cocaine they received from MEX the night before. At 12:39:45 p.m., COLE sent a text to JONES that read: How is it. At 12:40:12 p.m., JONES replied: A1. At 12:41:29 p.m., COLE responded: Only got back 293 dam. At 12:42:27 p.m., JONES responded: It gd tho. At 1:58:05 p.m., JONES sent a

62

text to COLE that read: Get me rdy for one probably two let me know. At 7:30:04 p.m., JONES (STT3) called COLE (779-500-9392). During the conversation, COLE said "Hey, 200 extra, 7 2 2 2 8 yeah." JONES replied "Actually 175." COLE responded "Well it should have been." JONES then said "Tell him (MEX) to let me know cuz I need to know if I need to save me some (cocaine)." COLE responded "What'ch you want me to tell him? 2? 1? What?" JONES replied "Shit, by the time he get rid of it I'll be making for the 2." JONES then said "I went on 13th street and they getting hit with a biddy. Hey, swear to god on my mamma, Gek (SMITH) got 14 for 5. I told him it was somebody else's." Case agents believe that during the above call, JONES was telling COLE to contact MEX to get 1 to 2 more kilograms of cocaine. JONES also told COLE that he was selling ounces for $1,300 and that SMITH sold 5 ounces at $1,400 per ounce.

- On July 13 and 14, 2012, HARRIS (414-519-2260) and JONES (STT3) exchanged text messages and phone calls during which they arranged a cocaine transaction at the J-Spot. On July 13, at 1:01 p.m., HARRIS sent a text that read: Cuz can I meet u somewhere. At 1:02:26 p.m., JONES replied: I m stuck wit lil j rite now. At 2:12:50 p.m., HARRIS responded: He still on u. At 2:13:59 p.m., JONES replied: He wAlk down an pookie. At 9:45:35 p.m., HARRIS sent a text message that read: Damn cuz I still can t come by. At 10:39:42 p.m., HARRIS sent another text: Cuz get me right. At 10:48:00 p.m., JONES replied: Only soft 600. At 10:50:51 p.m., HARRIS responded: K. At 10:51:45 p.m., HARRIS texted: Cuz I only got 5 on me5.

- On July 14, at 11:42:58 a.m., HARRIS texted: Got that for u. At 2:55:36 p.m., HARRIS texted: Can I come get it. At 3:11:56 p.m., HARRIS called JONES and JONES said, "I have one left. I have another "H." I'm just waitin for Lil Jones to leave man." HARRIS replied, "Ok. Its uh, Its uh umm. Its a whole one?" JONES said, "Naw, its only an H" (1/2 ounce). They then agreed that HARRIS would come to get the ½ ounce as soomn as OLIVER Jones left the J-Spot. At 6:19:36 p.m., JONES texted: Go to shop old girl (NICOLE TALSKY) got it (cocaine) u can give her bread (money) to text wen u there. At 6:21:42 p.m., HARRIS replied: Ok on my way. At 6:25:15 p.m., JONES responded: K. At 7:17:43 p.m., JONES texted: Where u. At 7:18:59 p.m., HARRIS replied: Leaving the crib meet u where. At 7:19:52 p.m., JONES texted: Old girl at shop. At 7:20:57 p.m., HARRIS replied: K. At 7:44:56 p.m., HARRIS texted: Outside cuz. At 7:45:27 p.m., JONES replied: Holla at girl.

- On July 14, 2012, at 3:18 p.m., J. TALSKY called JONES (STT3) and asked for advice on how to deal with Ashley LNU, a drug customer to whom she was supplying narcotics. JONES told TALSKY to control the transaction by telling Ashley to get her money (or collect the money from her own customer) and then come see TALSKY by herself. JONES explained that this was for TALSKY'S own protection because "if the person don't trust you enough to give you the money to come by yourself then you can't do it. That's how a lot of people get set up because they take someone with them and the person be the fucking police." JONES reminded TALSKY not to talk too much (about the drug transaction) on the phone.

63

- On July 14, 2012, at 6:47 p.m., JONES (STT3) received a text from FNU LNU a.k.a. "Swiff" at (262) 417-8163 stating "I'm here." JONES replied via text "Go to counter." Approximately two minutes later JONES received a telephone call from the J Spot and talked with a female working there. Based upon previous monitored calls, case agents believe the caller to be Nicole TALSKY. N. TALSKY asked "How much am I supposed to get for each one?" JONES replied "$650 for the seven." Based upon monitoring of STT3 and developed knowledge of the JONES DTO, affiant believes JONES is instructing N. TALSKY to supply "Swiff", a heroin customer who has come to the J Spot, with seven grams of heroin and to charge $650 for it.

- On July 14, 2012, at 7:43:49 a.m., JONES (STT5) sent a text to COLE (779- 500-9392) which stated: He call uyet. At 8:55:20 a.m., COLE replied: 1 or 2? At 8:55:35 a.m., JONES responded: 2. At 9:00:42 a.m., COLE replied: He said that was it lol make sum 20s$. At 9:01:27 a.m., JONES responded: Man that s fuck up damn I sold it all. Case agents believe that the above series of text messages indicated that JONES was attempting to purchase two more kilograms of cocaine from COLE and that COLE replied that he checked with MEX and MEX doesn't have any more cocaine. A further check of phone records revealed that on July 14, 2012, at 8:56:10 a.m., COLE (779-500-9392) made an outgoing call to 815-209-334 (MEX). I believe that during this contact COLE received information from MEX that he didn't have more drugs to sell to COLE. Case agents believe that when COLE stated, "lol make sum 20s$" in the above text message that COLE is joking with JONES and telling that JONES that he will have to sell small twenty dollar quantities of cocaine.

124. On July 15, 2012, at 8:36 a.m., Steve JONES (STT3) and OLIVER Jones engaged in conversation regarding the efforts of law enforcement. OLIVER stated when he was leaving the J-Spot that he noticed a black man in a Dodge Nitro sitting in the parking lot of a check cashing business which wasn't open yet. This concerned OLIVER who stated "When I come out the first time, I seen him sitting there because you know that's why I kept going" and, "I always ride around first" (conducting counter surveillance), "So ok I'm a gonna do one more round...I come back, he's still sitting there." OLIVER stated that they (law enforcement) have started using newer cars like the Nitro to fool the people they are investigating. JONES agreed with that train of thought and added "and then they gonna make it a black dude, and then they ain't got the windows tinted cause they know... we up on that tint." (**LOCATIONS A & B**).

64

125. On July 15, 2012, at 6:23 p.m., COLE contacted JONES (STT3) and they engaged in a conversation where they discussed, among many topics, individuals cooperating with Federal agents. JONES stated he has ordered a pager and is expecting it to arrive next week. JONES stated, for security reasons, he plans to have people call his pager, and he will then call them back from a private number. JONES told COLE the pager was for numbers only, no texts. Otherwise someone would text an incriminating statement like "I need a banana" and defeat the entire purpose of the pager. Case agents know "a banana" is code for "a split" which is also code for a quantity of four and a half ounces of cocaine.

126. On July 16, 2012, at 10:03 a.m., JONES (STT3) sent out a text message to at least twelve DTO associates and customers stating "New number 4142220433 after beep put number in ur calling from then press # and ill call u right back." Telephone records reveal that 414-222-0433 is a "USA Mobility" pager number for a one-way numeric pager. According to USA MOBILITY, this pager number can only receive numeric messages and cannot return messages. Case agents know that one-way numeric pagers were frequently used by drug traffickers during the 1990's as an easy, anonymous way to communicate with drug trafficking associates. Drug traffickers often used numeric pagers to thwart law enforcements efforts to investigate their drug trafficking activities. Case agents believe JONES obtained STT4 to further shield himself law enforcement investigation.

127. At 5:47 p.m., SMITH (GTT2) paged JONES at 414-222-0433 (STT4). Additionally, at 11 a.m., JONES began forwarding calls from 414-426-9266, his long-time personal cellular telephone, to 414-578-6713 (STT5). Case agents believe that JONES adopted the use of a pager, and purchased a new cellular telephone, because he is concerned with recent

65

arrests of known drug distributors (East Side Gangsters) in Milwaukee, WI. Case agents also believe that JONES did this to limit the number of individuals who actually have knowledge of STT5. Since that time, JONES' activity on STT3 dropped considerably and he appeared to transition his drug distribution activities to other devices, including STT4 (pager) and STT5.

128.     On July 16, 2012, at 7:29 p.m., SMITH (GTT2) recieved an incoming telephone call from an unknown male using telephone number (262) 891-2561. During the call, the UM asked SMITH what he wanted and SMITH replied "uh..eight." The UM stated "I'm gonna go grab it and I'll be on 42nd and Florist....Did you want me to go get it or what?" SMITH replied "yeah, yeah for sure." And the UM stated "Alright, I'm finna go grab it now." Case agents believe the UM is offering to supply SMITH with eight ounces of cocaine from an individual located in the vicinity of N. 42nd Street and W. Florist, Milwaukee, WI. At 8:00 p.m., case agents established surveillance of Smith's Sweets Shop at 5233 W. Center Street, Milwaukee, WI. (**LOCATION E**). Case agents observed a silver colored Jeep Commander bearing Wisconsin temporary vehicle registration H7259A parked on the east side of N. 53rd Street, facing northbound. Case agents have observed SMITH driving this vehicle on multiple occasions. At 8:17 P.M., case agents monitored an outgoing telephone call from SMITH (GTT2) to the UM (262)891-2561. During the call, the UM stated "I'm driving towards him now, he's just getting done from the hospital." SMITH then asked if they were going to meet and asked "You for sure man? Tell him I'm for sure." The UM replied he would. At 8:25 p.m., case agents observed SMITH exit the candy shop (**LOCATION E**) and enter the Jeep Commander through the driver's side front door. Two other unidentified black males followed SMITH out of the shop. One entered the Commander through the front passenger side door, one through the rear

66

passenger side door. SMITH then pulled away from the curb and drove eastbound on W. Center under constant surveillance. At 8:47 p.m., SMITH (GTT2) sent a text to the UM (262-891-2561) which stated "I'm good pimp I will call u." Case agents believe SMITH was telling the UM that he has the money for the proposed drug transaction and is ready to conduct the transaction.

129. Immediately after the above text message, at 8:47 p.m., SMITH (GTT2) called the UM (262-891-2561). The UM stated "I'm at 41st and Florist. I'm pulling off from here now." SMITH replied "Alright, pimp." At 9:00 p.m., case agents established surveillance of SMITH's residence at 3427 N. 67th Street, Milwaukee, WI (**LOCATION D**). Case agents observed SMITH's silver Commander parked at the south end of N. 67th Street, facing southbound. At 9:05 p.m., case agents monitored an incoming call to SMITH (GTT2) from the UM (262-891-2561). SMITH stated "I'm in front." The UM replied "Alright here I come." At 9:10 p.m., case agents observed the Chevrolet Tahoe parked on N. 67th Street in front of SMITH'S residence and in front of SMITH'S Jeep Commander (**LOCATION D**). One of the vehicles had its front headlights on. Case agents observed an individual standing on the passenger side of the Tahoe, apparently engaged in conversation with the occupants. At 9:22 p.m., case agents observed the black Tahoe pulling away from the Commander, travelling north on N. 67th Street (**LOCATION D**). Case agents followed the vehicle under constant surveillance as it proceeded eastbound on W. Keefe Avenue. At that time, case agents noted the Tahoe was bearing Wisconsin vehicle registration 882-SKK. An inquiry with Wisconsin DOT indicated vehicle registration 882-SKK is registered to a 2000 black Chevrolet Tahoe (VIN #1GNEK13T6YJ134987) in the name of Aquashantina R. YOUNG (DOB: xx/xx/74), 1143 N. 29th Street, #103, Milwaukee, WI, 53208. Case agents followed the black Tahoe to the area of

the 5900 block of N. 41st Street. At 9:35 p.m., case agents observed the Tahoe stop in front of 5949 N. 41st Street, Milwaukee, WI. A black male (UM2) exited the vehicle carrying a plastic bag in one hand and proceeded to the side of 5949 N. 41st Street and out of sight.

130. On July 18, 2012, at 12:17 p.m., Gina LNU (414-264-5090) called JONES (STT3). JONES told Gina LNU that the number he was currently using (STT3) will "go off on the 30th." From that point, JONES stated he planned on dealing with individuals with his pager. During their conversation, JONES mentioned he was wary of recent Federal arrests in Milwaukee, saying "I can't have people having direct contact with me anymore with that stuff because ….couple people that got popped been on the phone and see what they doing is they let police tap their phone, you know… and that's what the shit that's been going on."

131. On July 24, 2012, case agents received information from CS-12 who stated that he/she went to the J-Spot restaurant earlier in the day and spoke to Steven JONES and OLIVER Jones. OLIVER told CS-12 that they, OLIVER and JONES, were expecting to get more drugs tonight and Oliver told CS-12 to call if he/she needed anything. Oliver told CS-12 that his cell phone number is 364-6338 (414-364-6338). CS-12 stated that JONES told him/her that Moe (Morris JONES) is in custody and that Moe is talking to the IRS and telling them that JONES was "paying him under the table" and other things. Steve told CS-12 that they are not selling out of the J-Spot, except to people that they really trust. CS-12 stated that he/she also recently talked to William BANKSTON (a.k.a. "Boo") and that BANKSTON told CS-12 that he had been buying cocaine from Gek (Getharia SMITH), but that SMITH is not getting his cocaine from Steve (JONES) anymore. BANKSTON told CS-12 that SMITH has a new source and that the

68

cocaine is not as good as the stuff he got from Steve JONES and OLIVER Jones. (**LOCATIONS A & B**).

132.    On July 26, 2012, case agents received information from CS-12 who stated that William BANKSTON told CS-12 that he got two ounces of cocaine from OLIVER Jones earlier in the day and that he was going to cook it up (cook the powder cocaine into crack cocaine).

133.    On July 27, 2012, JONES began forwarding calls from his long time phone number of 414-426-9266 to STT6. A check of phone records regarding STT6 revealed that JONES was contacting members of his DTO including OLIVER Jones, Jessica TALSKY, Devon Chase COLE, and Dean ROUSE. Case agents believe, based upon the decreasing volume of incoming and outgoing calls on STT5, forwarding of calls from 414-426-9266 to STT6, and information gathered from phone records for STT6 (call activity with known drug associates) that JONES is the primary user of STT6 and that he is now using STT6 to arrange drug transactions and direct members of his DTO.

134.    On August 2, 2012, at 10:50 a.m., under the direction and control of case agents, CS-12 went to the J-Spot to engage in conversation with JONES DTO members. At 10:54 a.m., case agents observed CS-12 leave the J-Spot and followed CS-12 to a pre-determined meet location. Case agents interviewed CS-12 who stated that he/she spoke to Steven JONES and that JONES told CS-12 that they didn't have cocaine available to sell right now, but that "his guy" (MEX) had it, and they would be getting it soon. A check of phone records revealed that STT6 had two phone contacts with COLE (779-500-9392) on July 31, 2012 and that COLE had four contacts with MEX (815-209-3348) on July 31, 2012 and two contacts with MEX on August 2, 2012. (**LOCATIONS A & B**).

69

135. On August 13, 2012, at 7:54 p.m., ROUSE (414-419-4350) called JONES (STT6) and told JONES that his customer (drug) will be call in a minute. JONES told ROUSE that all he has is soft left (powder cocaine). JONES told Rouse that he can cook it into crack if ROUSE gets him a Pyrex jar. JONES told ROUSE to go to Pick and Save or another store a get a jar. ROUSE said he has to get another car, he can't ride the one he has.

136. On August 13, 2012 at 4:54 p.m., a phone call was intercepted between JONES (STT6) and J. TALSKY (414-610-1838). J. TALSKY stated that "Joe" just called her. JONES replied that he paged him 911 too. J. TALSKY informed JONES that Joe wanted a "whole pint" and JONES specified that he wanted "that brown" (heroin). J. TALSKY told JONES she would tell "Joe" that he (JONES) was coming this way. At 5:24 p.m., a call was intercepted where J. TALSKY told JONES that "Joe" has $200 and she is going to get that ready for him. (**LOCATION J**).

137. On August 14, 2012, at 8:34 p.m., a phone call was intercepted between JONES (STT6) and TALSKY. During the call, TALSKY stated that she made $250 off a quarter ounce. JONES instructed her that this is short and told her last time she made 15 bags out of it. TALSKY informed him that she made 10 bags (crack cocaine) out of the quarter ounce. JONES asked her to give him as much as possible. She specified she can make them people because, "your people are used to them smaller." JONES stated that last time the bags were too big. Case agents heard a baby in the background during the conversation and while she was bagging dope for JONES. (**LOCATION J**).

138. On August 15, 2012, under the direction and control of case agents, CS-12 went to the J-Spot to engage in conversation with JONES DTO members. CS-12 contacted case

70

agents later in the day and provided the following information. While sitting at a table in the J-Spot, JONES told CS-12 that Gek (SMITH) is getting bad dope from Chicago, OLIVER is getting bad dope from Indiana, JONES is buying single ounces of good dope from Jessica's (TALSKY) associate, and JONES is selling heroin and pills. CS-12 said JONES pulled out a bottle of "30's" with him (30mg Oxycontin) to show CS-12. JONES said he could sell CS-12 an ounce for $1,400. JONES further told CS-12 that JONES would get him a larger quantity of cocaine, a 9 piece (9 ounces), when JONES received good cocaine again. (**LOCATIONS A &** **B**).

139. On August 15, 2012, at 4:52 p.m., JONES (STT6) called Jessica TALSKY. During the conversation, JONES talked about the guy that they were sitting at the table with (CS-12) and that this guy wanted to purchase an ounce of cocaine for $1500.00, but that JONES told him, "it's not around" (didn't have cocaine to sell to the guy).

140. On August 15, 2012, at 9:05 p.m., ROUSE (414-419-4350) called JONES (STT6) and told JONES that ROUSE saw the police near the J-Spot and that he was calling to check on JONES. (**LOCATIONS A & B**).

141. On August 17, 2012, at 9:33 a.m., call was intercepted between JONES (STT6) and Jessica TALSKY. JONES asked TALSKY if she left her residence yet (**LOCATION J**). Upon TALSKY responding no, JONES asked her to bring two of those "things." TALSKY agreed to do so. It should be noted that her child "Jayden" is in the background during this conversation.

142. On August 17, 20112, at 12:35 p.m., JONES (STT6) made an outgoing call to "J" (414-333-9778). During the conversation, JONES stated he was checking a text from "J" and

71

wants to know if he wants 8 and "J" replied that he is "walking down 28th Street 8 times" (wants to purchase 8 ounces of cocaine). JONES told "J" not to bring anyone with him. At 4:14 p.m., JONES (STT6) called "J" (414-333-9778). During this call, "J" stated that he "has it just right" (that he has the money). "J" told JONES that he has "9 and then 18" and that he "counted the money." JONES asked who "J" is coming with and that "J" should come in the back way because JONES doesn't want Lil-Jones (OLIVER) to see "J." JONES told "J" to text him when he arrives. At 4:20 p.m., "J" (414-333-9778) called JONES (STT6) and stated that he is there (J-Spot). JONES told "J" to stay close to the day care and not to come through the door way to the shop because he doesn't want Lil-Jones (OLIVER) to see him. JONES told "J" to come through the back door and go "upstairs." GPS data for STT6 indicated that it was located at the J-Spot at approximately 4:23 p.m. Case agents believe that "J" wanted to buy 8 ounces of cocaine from JONES. Case agents know that JONES' going rate for an ounce at this time was $1400 (1400 x 8 = $11,200). Case agents believe that "9 and then 18" would be $9,000 plus $1,800 for a total of $10,800 for the 8 ounces. (**LOCATIONS A & B**).

143. On August 18, 2012, at 10:25 a.m., Jessica TALSKY (414-610-1838) called JONES (STT6). During this call, JONES told TALSKY that she shouldn't borrow money to a drug addict and that that what she is doing is "dangerous" by letting "Katelynn" know what she's doing and letting her come and get stuff (drugs) at her house. (**LOCATION J**). JONES told TALSKY that by "Katelynn" being at TALSKY's house, that if she (Katelynn) gets "popped" (arrested) that "the police can get a search warrant" for TALSKY's house. TALSKY told JONES that she hasn't been doing "anything" (TALSKY denies that she is selling drugs from her house). Case agents believe that TALSKY is keeping drugs at her home and that JONES is warning her

not to sell to drug addicts from her house because it would be easy for the police to get a search warrant with information from the drug addicts). (**LOCATION J**).

144.    On August 19, 2012, at 4:17 p.m., JONES (STT6) called Jessica TALSKY (414-610-1838). During this conversation, JONES stated, "Give me a quarter of a what-you-ma-call-it and 2 of them Dormins" (commonly used as a cutting agent for heroin). TALSKY asked, "A quarter of what?" JONES replied "A quarter... Now you get what I'm saying. Break them down in four quarters." TALSKY said "Yeah." JONES stated "I need one of them quarters and two of them Dormin pills." TALSKY replied "All right. When?" JONES said "Ah you can get it ready now. I'm on my way there." A check of GPS data indicated that STT6 was at Jessica TALSKY's residence at approximately 4:23 p.m. At approximately 4:36 p.m., JONES (STT6) received a call from TALSKY (414-610-1838). During this call, TALSKY stated "You have 11 left plus that one I just broke for you." JONES stated "Oh, Ok, ok, ok, ok." TALSKY replied "OK." JONES said "Good, Good, Good." TALSKY replied "So you have more than what you thought you had." JONES stated "I know." TALSKY said "All right." Case agents believe that TASKY was storing heroin at her house for JONES and that JONES went to her house and picked up a quarter ounce of heroin as well as cutting agent for same. (**LOCATION J**).

145.    On August 19, 2012, at 6:39 p.m., COLE called JONES (STT6). During the call, COLE told JONES that MEX stated it would be tomorrow (August 20, 2012). JONES said that if COLE's guy does come through tomorrow, he (JONES) would be happy. JONES told COLE that if it's tomorrow he has to up his game. COLE told JONES that JONES needs to move the shit (cocaine) slow. JONES told COLE that JONES is getting JONES' house paid for. JONES said that it's (drug proceeds) going towards the house. COLE told JONES that JONES has to

73

give "them" something to get them out the way.  JONES told COLE that once JONES' house is done, he doesn't have anything big to spend his money on.  COLE said by him getting his chain out the pawn shop and getting rid of his storage, he saves $510 a month.  JONES said that all his money will be saved after he gets done with his house.  COLE said that he is going to a club in Gary, Indiana where a lot of ballers hang out.  COLE said that he may go in order to see if he can get some connections, and he doesn't want to end up like JONES and not be able to do nothing.  COLE told JONES that if they get some "food" around that time, he isn't going.  COLE (playfully) told JONES to watch his mouth and that he will cut his water and JONES will be "taking that trip back down to Tex."  JONES apologized.  JONES said that if he get this (cocaine), he will be straight.  JONES said "One of em (kilogram proceeds) is going to pay the rest of the house."  JONES said that he sold all his cars...Audis and Cadillac Trucks.  He said that he "got to get back (on).  COLE then talked about getting some work done on his vehicle. COLE told JONES that if his guy (MEX) does come through tomorrow, COLE will call JONES back.

146.  On August 20, 2012, at 8:02:40 p.m., Jessica TALSKY called JONES (STT6).  During the call, JONES told J. TALSKY that "three dudes tried to get in shop last night and dudes tried to get in the shop today."  JONES said "sooner or later someone gonna try."  J. TALSKY asked why JONES didn't mention it sooner.  JONES said he was mad and plans to leave to leave the gate open (at the back of the J-Spot) and sit on the corner and catch them.  JONES said the guys told Nicole (TALSKY) they know the owner.  J. TALSKY said "somebody had to tell them something.  They must know something to go to the back door and try that shit."  JONES said "There's cameras in the back, on the kitchen and everything."  J. TALSKY said

74

"There's cameras everywhere." They then continued to talk about the possibility of the J-Spot being robbed. (**LOCATIONS A & B**).

147. On August 20, 2012, at 10:22 p.m., JONES (STT6) received a call from COLE (779-500-9392). During this call, COLE stated that he was at MEX's house and MEX's woman, "Sherry" was telling him about another woman that MEX was seeing. JONES asked COLE "what did he say about our thang?" COLE replied that he (MEX) said, "The next couple days." JONES responded "I be wanna bring that what-cha-call-it (money) to you early. I be on pins and needles." JONES then talked about opening up his shop (J-Spot) on Sundays with a soul food cook. He said that the cook is going to bring him food for the next week. The then talked about one of JONES former girlfriends. JONES ended the call by stating "He (MEX) said two days, right." COLE replied "Yep."

148. Telephone records reveal that MEX's number, 815-209-3348, frequently calls phone number 815-981-0486 (279 contacts from June 6, 2012 to July 23, 2012) which is subscribed to a Sheri TORRES. A check of law enforcement records revealed that a TORRES lives at 1224 S. Court Avenue, Rockford Illinois and that this address is also associated with JOSE ELPIDIO DURAN (H/M, DOB: xx/xx/81). Records also revealed that Jose DURAN and Sherri L. TORRES are the registered owners of a 2003 Chevrolet Trailblazer SUV with Illinois plate N541175 (VIN# 1GNET16S336206062) with a listed address of 1224 S. Court Street Apt.1, Rockford Illinois 61102. A further check of law enforcement records revealed that DURAN is also associated with 4436 N. 23rd Avenue, Apt. 4, Phoenix, AZ. A criminal history check revealed that Jose DURAN (DOB: xx/xx/81) was convicted of Manufacture/Delivery 15/+GR COCAINE/ANALOG on September 23, 2005. (Illinois).

75

149. On August 22, 2012, case agents set up surveillance in Rockford, IL to observe the activities of Jose "MEX" DURAN, DURAN's residence, and also the residence of Devon Chase COLE. Based on the investigation to date of the JONES DTO, DURAN supplies kilograms of cocaine to JONES and COLE in Rockford. COLE distributes his cocaine in the Rockford area JONES transports his cocaine back to Milwaukee, Wisconsin for distribution.

150. At 3:35 p.m., surveillance was conducted on 1224 S. Court Street, Rockford, Illinois. This is the residence of DURAN, and DURAN's girlfriend Sheri TORRES. Parked in the front yard of the residence, surveillance observed a silver 2003 Chevrolet Trail Blazer with Illinois Registration N541175. This vehicle was registered to Jose DURAN and Sherri TORRES, 1224 S. Court Street, Apt 1, Rockford, IL. Photographs were taken of this residence, and the pictures show that there are steel storm doors over the front door, and side (north facing) door, and that there are steel bars positioned over the windows on the first level. The only first floor window observed that did not have external steel bars covering it, was located on the north side of the residence. Observation of the back of the residence could not be conducted. There is also an outside staircase that leads to the upper unit at the residence.

151. Based on the T-III wire intercept investigation, case agents know that DURAN's (MEX's) cellular telephone number is 815-209-3348. Through court-authorized review of GPA data for DURAN's cellular telephone, case agents were able to locate DURAN at 1605 Genoa Street, Rockford, Illinois. DURAN was working with an associate putting aluminum siding on that residence. While driving past the residence, case agents observed Rockford Police Department squad cars parked on Genoa Street. The Rockford Police Officers were responding to a residence alarm in the vicinity of 1605 Genoa Street. At 3:53 p.m., case agents made contact

76

with Rockford Police Department officers and elicited their assistance in approaching DURAN and his associate to confirm their identities. One of the officers then drove to 1605 Genoa Street.

152.    At 4:03 p.m., the RPD officer met with SA Krueger at a location in Rockford, Illinois. The officer stated that he approached the residence and met with DURAN's co-worker Jose MEDRANO. MEDRANO told the officer that his date of birth was xx-xx-1972. MEDRANO then spoke in Spanish to the other individual who was on a ladder working on the side of the house. MEDRANO stated that his co-worker's name was Jose DURAN. DURAN had his back to the officer, but turned his head to look in the direction of MEDRANO. The officer stated that DURAN was a short individual, shorter than 5'10." The officer was shown a picture of DURAN, and the officer stated that the picture looked like the individual on the ladder. However, DURAN had on a hat, and DURAN did not look directly at the officer. The officer then left the area. Case agents continued surveillance on DURAN and MEDRANO working at 1605 Genoa Street. Parked in the vicinity of the residence, case agents observed a GMC SUV with Illinois Registration N793812. This vehicle was registered to Jose Sierra, 205 Hunter Avenue, Rockford, Illinois.

153.    At 4:37 p.m., surveillance was conducted on Devon COLE's residence located at 216 Adams Street, Rockford, Illinois. Parked in front of the residence, case agents observed a white Dodge minivan with Illinois Registration N217689. This vehicle was registered to Rickesha CAINE, 303 S. 4th Street, Apt 1, Rockford, IL. Two other vehicles were also observed in the vicinity of the residence: A red Chevrolet four door vehicle which had Illinois Registration N336812. This vehicle was registered to Shamekwa STARNES at 1816 Pierce Street, Rockford, IL. The other vehicle was a Chevrolet SUV with Illinois Registration P515190. This vehicle was

registered to James C. Hillsman, 515 Seminary Street, Apt 316B, Rockford, IL. At approximately 4:38 p.m., surveillance was terminated.

## IX. FINANCIAL INVESTIGATION

154.    Case agents have initiated a financial investigation of JONES, SMITH, and their associates, including an ongoing money laundering investigation. During the course of the investigation it has been determined that Getharia SMITH is renting a store front located at 5233 W. Center Street (LOCATION E). SMITH was interviewed during a drug investigation on March 16, 2012 and SMITH told investigators that he is in the process of opening up a candy store named "SMITH'S SWEETS SHOP." Case agents have checked this location several times and the business is not open and SMITH is not normally at the business. SMITH also told investigators that he was an unlicensed carpenter that worked for family and that the cash ($1,173) he had in his possession when arrested on March 16 was from flipping some used vehicles. SMITH went through the two vehicles he had sold and the total income came out to approximately $800 dollars over the past several months. Case agents have observed SMITH at the J-Spot at on numerous occasions and at various times of day, but have not observed SMITH conducting activities consistent with working at the restaurant.

155.    Through the course of the investigation, case agents have observed SMITH driving the following vehicles: a black 4dr 1996 Nissan Maxima with Wisconsin plate "148-SNB," which is listed to Amber U. Smith (DOB: x/x/94); a green 1995 Dodge Ram pickup truck with Wisconsin plate "JB6343," which is also listed to Amber U. Smith; and a green minivan with Wisconsin plate "284-TRX," which is listed to CHALUNDA SMITH. Case agents know that Amber Smith is Getharia and CHALUNDA SMITH's 17 year old daughter.

78

156.    State of Wisconsin tax records for SMITH reveal that he filed no state income tax returns in 2007, 2009, or 2010.  In 2008, SMITH did file a state tax return, reporting: State Taxable Income of $12,133.00 and State Tax Refund of $1,583.00.  In 2011, SMITH did file a state tax return, reporting: employment at Fat Boys, Inc., located at 3427 N. 67th St., Milwaukee, WI (**LOCATION D**); State Taxable Income of $17,834.00; and State Tax Refund of $998.00.

157.    Credit history for Getharia SMITH reveals that his most current employer is listed as "C J INC."  Further investigation regarding this employer came back with negative results.  It should be noted that the credit history listed SMITH's current address as 4528 N. 67th Street (dated August 2011) and also gave an address of 3427 N. 67th Street (**LOCATION D**) and noted that, SMITH's credit history lists numerous collections entries.

158.    Case agents reviewed documents dated March 28, 2012 provided by the State of Wisconsin Department of Workforce Development which revealed that there was no record of employment for Getharia SMITH and Steven JONES in this data base.  Affiant believes that based on the examination of financial records, the examination of law enforcement and public records, surveillance, and interviews of confidential sources that SMITH does not have an ongoing legitimate source of income.

159.    Case agents have conducted surveillance and interviewed informants and believe that JONES owns and operates the J-Spot Restaurant and that JONES also uses the J-Spot as a hub for the drug trafficking activities of the DTO.  For example, on July 14, 2012, at 7:45 p.m., JONES (STT3) made an outgoing call to the J Spot at 414-444-4870.  At the time, JONES was distributing cocaine from the apartment upstairs.  During the call, JONES told Nicole TALSKY "My cousin getting ready to come in…He owes you seven, $700…cause he got three of them."

Case agents believe JONES was instructing N. TALSKY to collect $700 from JONES' cousin because it is money owed to JONES who does not want to come downstairs at that time. Case agents further believe that issuing a subpoena to the J-Spot would alert JONES, SMITH, and other coconspirators that they were being investigated and therefore it is not feasible to obtain employment records from the J-Spot. (**LOCATIONS A & B**).

160. CS-6 stated JONES buys distressed properties, remodels them, and then re-sells them for a profit. JONES sells the majority of these properties to other drug dealers. CS-6 stated that Steven JONES is friends with an individual who works at HUD, possibly named "Todd," and that JONES is able to locate and purchase these properties through Todd at a very low cost. CS-6 stated that JONES had a state probation agent who was also involved in purchasing properties and that this agent is related to JONES' sister-in-law's husband. JONES introduced his probation officer to Todd at HUD so the agent could also acquire properties. CS-6 stated that JONES has had numerous law enforcement contacts and arrests while on probation and has never been revoked. CS-6 stated that JONES' probation agent will not "revoke" him because of their business relationship. CS-6 went with JONES to one of his meetings with the probation agent. After that meeting, JONES expressed confidence that he would never be revoked.

161. On June 30, 2012 at 10:49 a.m., SMITH (GTT2) called Lee ELLIS (414-217-3002). During this conversation, SMITH and ELLIS talk about a house that he and CHALUNDA JONES want to purchase. ELLIS advised SMITH regarding techniques for fraudulently applying for the loan so the bank will approve the loan. They talked about SMITH's wife, CHALUNDA JONES, using ELLIS's company as the source of her income or setting up a company for CHALUNDA and that ELLIS will get check stubs ready. Case agents know that CHALUNDA

80

does not work for ELLIS and doesn't have a legitimate source of income. During the conversation SMITH told ELLIS, "that is how we got the house in Texas," referring to another house that SMITH and CHALUNDA fraudulently purchased. ELLIS and SMITH talk about filing income taxes and SMITH said CHALUNDA didn't file last year. ELLIS replied that they have to "put something on deck for her" and work that out so "we ain't talking about outlaying no money." ELLIS further stated, "But gotta make it look right, cause these days, man, they be running that 4506."

## X. TARGET LOCATION SPECIFIC INFORMATION

162. Wisconsin Department of Financial Institutions records indicate "THE J SPOT LLC" was registered by Stephen JONES on 9-14-2010 as a domestic LLC. JONES listed 3872 N. Teutonia Avenue, Milwaukee, WI as an address/office. WE Energies records for the J SPOT RESTAURANT, 3872 N. Teutonia Avenue, Milwaukee, WI (**LOCATION A**) revealed the following:

- Account Name: J SPOT RESTAURANT
- Owner: Stephen JONES (Steven JONES)
- SSN: 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
- Established: 08-31-2010
- Tax ID#: 272360234
- Telephone Numbers: (414) 426-9266 & (414) 419-8832

163. Case agents have also determined that JONES utilizes an apartment above the J SPOT RESTAURANT as a drug stash and distribution location. An inquiry with the WI-DFI indicated Milwaukee Developers LLC was registered by Stephen JONES on April 15, 2010, as a domestic LLC. JONES listed 3928 N. 41st Street, Milwaukee, WI (**LOCATION C**) as an address/office. The Entity ID Number is M077484. An inquiry with WE Energies for 3872A N.

81

Teutonia Avenue, Milwaukee, WI (**LOCATION B**) revealed the following:

- Account Name:         Milwaukee Developers LLC (since 07-22-2011)
- Owner:                Stephen JONES
- Previous Acct. Name: Stephen JONES
- Telephone number:    (414) 426-9266

149.   Case agents have determined that Stephen JONES, a.k.a. Steven JONES, and Verlencer JONES, a.k.a Verlencer MASON, live at 3928 N. 41st Street, Milwaukee, WI (**LOCATION C**).  WE Energies records for the account at that address indicated the following information:

- Account Name:         Verlencer F. MASON
- Address:              3928 N. 41st Street, Milwaukee, WI
- Telephone Number:    (414)449-5422
- SSN:                  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
- Other Resident Name: Lynn JONES
- Employment:           Ameritech since November 2005
- Remarks:              Lynn JONES is listed as the spouse of Verlender Mason-JONES

151.   Case agents have determined that Getharia SMITH lives at 3427 N. 67th Street, Milwaukee, WI (**LOCATION D**).  WE Energies records for that address revealed the following information:

- Name:                 Juanita SMITH
- SSN:                  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
- Telephone Number:    (414)442-4048
- Established:          09-20-2010
- Previous address:    3425 N. 67th Street, Milwaukee, WI

152.   Juanita SMITH is the mother of Getharia SMITH.  Juanita SMITH is listed as an alternate contact for the storage units rented by Getharia and CHALUNDA SMITH (JONES) at A-1 Stor-All, 9946 N. Granville Road, Mequon, WI (**LOCATIONS G & H**).

82

153.    On August 7, 2012, an inquiry with WE Energies regarding 5233 W. Center Street, Milwaukee, Wisconsin (**LOCATION E**) revealed the following:

- Account Holder:      Fat Boys, INC
- Tax ID #:            3524323860
- New Tennant:         Getharia SMITH
- Contact Phones:      (414) 982-0979, (414) 419-1164

154.    WE Energies records indicate that SMITH contacted WE Energies on January 25, 2012, and stated he was the new tenant at 5233 W. Center Street, Milwaukee, WI as of January 1, 2012 and was calling to activate the account in the name of FAT BOYS, INC.  WE Energies contacted the building owner and confirmed that SMITH was in fact the new renter at that location.  An inquiry with the Wisconsin Department of Financial Institutions indicated FAT BOYS, INC was registered as a domestic business by (registered agent) Getharia SMITH, effective date of January 9, 2012, filed date of January 17, 2012.  SMITH listed 3427 N. 67th Street, Milwaukee, WI, 53216 (**LOCATION D**) as his contact address.  Case agents have observed Getharia SMITH entering and exiting SMITH'S SWEET SHOP at 5233 W. Center Street, Milwaukee, WI on multiple occasions throughout July 2012 (**LOCATION E**).

155.    Case agents have determined that Oliver JONES lives at 2444 N. 15th Street, Milwaukee, WI (**LOCATION F**).  An inquiry with WE Energies for that address revealed the following:

- Name:                Tennita MAGEE (Girlfriend of Oliver JONES)
- SSN:                 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
- Telephone numbers:   (414) 803-5242 & (414) 462-7046
- Established:         03-28-2006
- Alt Address:         3878 N. 67th Street, Milwaukee, WI

158.    On August 14, 2012, at approximately 10:15 a.m., case agents conducted

83

surveillance on 2444 N. 15th Street, Milwaukee, WI. This is the residence of Oliver JONES. Parked inside the fence surrounding the residence, case agents observed a blue motorcycle covered in clear plastic. Case agents were not able to get any identifiers on the motorcycle. However, the motorcycle was the same size, shape and color of the motorcycle driven by Oliver JONES as observed by case agents on multiple occasions.

159.    Surveillance of Getharia SMITH has shown that SMITH went to A-1 STOR-ALL, 9946 N. Granville Road, Mequon, WI, 53097, on multiple occasions, indicating SMITH utilized a unit at the facility (**LOCATIONS G & H**). Recently gathered information indicated that Steven JONES also rented a unit at an area storage facility, possibly the same facility as SMITH. Subpoenaed records from A-1 Stor-All Inc. revealed the following information:

- Unit Numbers:         E-09 & E-10 (10x40) (**LOCATION G & H**)
- Tenant:               Getharia and CHALUNDA SMITH
- Start Date:           3-17-2012
- Address:              3425 N. 67th Street, Milwaukee, WI, 53216
- Alt Address:          3427 N. 67th Street, Milwaukee, WI, 53216 (**LOCATION D**)
- Res. Phone:           414-755-2081
- Cell Phone:           414-419-9358
- New Phone:            281-743-4428
- Alt. Phone:           414-982-0879
- Drivers Licence:      S530-2937-0150-07
- Code:                 122992
- Rate:                 $160/month
- Alt. Contact:         Juanita SMITH  414-442-4048

- Unit Number:          C-41 (10x25) (**LOCATION I**)
- Tenant:               Stephen & Verlencer JONES
- Start Date:           09-22-2011
- Address:              3928 N. 41st Street, Milwaukee, WI 53216 (**LOCATION D**)
- Mailing Address:      3872 N. Teutonia Avenue, Milwaukee, WI 53206 (**LOCATION A**)
- Res. Phone:           414-426-9266

84

| | | |
|---|---|---|
| • | Bus. Phone: | 414-444-4870 |
| • | Cell Phone: | 414-627-3402 |
| • | Drivers Licence: | S520-7806-8420-05 |
| • | Code: | 180756 |
| • | Rate: | $99/month |
| • | Alt. Contact: | Oliver JONES (brother): 414-364-4703, 2444 N. 15th Street, Milwaukee, WI (**LOCATION F**) |

160. Case agents were also provided with record of when SMITH entered and exited the storage facility on Granville Road between June 2, 2012 and July 20, 2012 (the date of execution of the Grand Jury Subpoena). Records indicate that JONES did not enter the facility (using his access code) during that time frame. However, JONES could have entered using SMITH'S code, or followed another customer into the facility without punching in a code. The enter/exit records are purged periodically, typically on monthly basis.

161. On July 16, 2012, at 5:50 p.m., case agents intercepted SMITH (GTT2) talking with CHALUNDA JONES (832-677-1219). During the conversation, SMITH told CHALUNDA JONES "I'm finna drop this money off at the storage." (**LOCATIONS H & G**). CHALUNDA replied "Oh." At 6:04 p.m., case agents intercepted JONES (STT3) talking with SMITH (414-803-8952). During the conversation, SMITH told JONES that he was at his storage unit (**LOCATIONS G & H**). Records obtained from A-1 STOR-ALL for SMITH indicate, on July 16, 2012, SMITH entered their facility on N. Granville Road at approximately 6:00 p.m., and exited at approximately 6:03 p.m.

162. Case agents have determined that Jessica TALSKY lives at 3039A S. 43rd Street, Milwaukee, Wisconsin (**LOCATION J**). On August 20, 2012, an inquiry with WE Energies for that address revealed the following for the above location:

| | | |
|---|---|---|
| • | Name: | Jessica TALSKY |

85

- SSN: 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
- Telephone numbers: (414) 610-1838 and (414) 554-2256
- Established: 10-01-2010

## XI. REGARDING COMPUTER SYSTEMS AND STORAGE DEVICES

163.    The records, documents, and/or materials listed on the attached list of "Items to Be Seized" may be in the form of paper or stored in the form of magnetic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. These items may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of the crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of the crime in the form of electronic data.

164.    Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of the crime, contraband, instrumentalities of the crime, and/or fruits of the crime. The attached list of "Items To Be Seized" requests permission to search and seize records and documentation relating to the JONES DTO and the individuals and businesses listed in Attachment A, including those records and documentation that may be stored in electronic format. This affidavit also requests permission to seize the computer hardware (and associate peripherals), including any laptop computers that may contain records and documents if it becomes necessary for reasons of practicality to remove the computer hardware, software, or other electronic storage device and conduct a search off-site.

165.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know

86

that electronic data can be stored on a variety of computer systems and storage devices. Based upon my knowledge, training, and experience, I am aware that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because:

a. The volume of evidence - Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he/she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence of instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b. Technical Requirements - Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

c. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

166. In light of these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the

87

evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

## XII. CONCLUSIONS

167.   Based upon the facts set forth above, I believe there is probable cause that beginning sometime in 2010, and continuing to the present time, in the State and Eastern District of Wisconsin, and elsewhere, STEVEN JONES, GETHARIA M. SMITH, OLIVER JONES, DEVON CHASE COLE, JOSE ELPIDIO DURAN, CHALUNDA JONES, TIFFANY M. MARTINEZ, JESSICA TALSKY, DEAN ROUSE, WILLIAM BANKSTON, and NICOLE TALSKY have committed, and will continue to commit violations of Title 21, United Stated Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications facilities to facilitate controlled substance felonies); and Title 18, United Stated Code, Sections 1952 (interstate travel or transportation in aid of racketeering enterprises), and 1956 and 1957 (money laundering) (Target Offenses).

168.   Based upon the facts set forth above, I further believe there is probable cause that items described in Attachment A of this affidavit are evidence of the Target Offenses described in this affidavit and are currently located at the following premises, more particularly described above:

A.   The J-Spot Restaurant 3872 N. Teutonia Avenue, Milwaukee, WI (Business of Steven JONES) (LOCATION A).

B.   Milwaukee Developers, LLC, 3872A N. Teutonia Avenue, Milwaukee, WI (Business of Steven JONES) (LOCATION B).

C.   3928 N. 41st Street, Milwaukee, WI (Residence of Steven JONES) (LOCATION C).

88

D. 3427 N. 67th Street, Milwaukee, WI (Residence of Getharia SMITH) (LOCATION D).

E. 5233 W. Center Street, Milwaukee, WI (Getharia SMITH's Candy Store) (LOCATION E).

F. 2444 N. 15th Street, Milwaukee, WI (Residence of Oliver JONES) (LOCATION F).

G. A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, WI, Unit Number E-09 (Storage Unit rented by Getharia and CHALUNDA SMITH) (LOCATION G).

H. A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, WI, Unit Number E-10 (Storage Unit rented by Getharia and CHALUNDA SMITH) (LOCATION H).

I. A1 STOR-ALL Storage Facility, 9946 N. Granville Road, Mequon, WI, Unit Number C-41 (Storage Unit rented by Stephen and Verlencer JONES) (LOCATION I).

J. 3039A S. 43rd Street, Milwaukee, WI (Residence of Jessica TALSKY) (LOCATION J).

169. I therefore respectfully request that search warrants be issued authorizing the search of the above locations for items described in Attachment A, which constitute evidence, fruits, and instrumentalities of the Target Offenses described in this Affidavit.

89

# ATTACHMENT A - Items to Be Seized

1. Paraphernalia associated with the manufacture and distribution of controlled substances, including but not limited to scales and other measuring devices, packaging materials, containers to hold controlled substances, and documents related to the manufacture, harvesting, distribution, sale, or possession of controlled substances.

2. Duffel bags, suitcases, plastic containers, shipping boxes, or other containers used to hold, ship, or transport controlled substances.

3. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities.

4. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, safes, safe deposit box keys and records, storage location keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of drug trafficking activities, or financial transactions related to drug trafficking activities.

5. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

6. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding among and between members and associates involved in drug trafficking activities.

7. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities.

8. Cellular telephones, SmartPhones, pagers, text messaging systems, and other communication devices, including devices capable of sending, receiving, or storing e-mails, and any and all records associated with such communications services.

9. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel.

11.    Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, and keys.

12.    Photographs, videotapes or other depictions of assets, coconspirators, controlled substances, or other activities related to drug trafficking activities.

13.    Any computers or electronic media that were or may have been used as a means to commit the offenses described on the warrant. For any computer hard drive or other electronic media (hereinafter, "MEDIA") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

     a.  evidence of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

     b.  passwords, encryption keys, and other access devices that may be necessary to access the MEDIA; and

     c.  documentation and manuals that may be necessary to access the MEDIA or to conduct a forensic examination of the MEDIA.

14.    Records and things evidencing the use of the Internet to communicate, including routers, modems, and network equipment used to connect computers to the Internet; records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

15.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

# ATTACHMENT A - Items to Be Seized

1. Paraphernalia associated with the manufacture and distribution of controlled substances, including but not limited to scales and other measuring devices, packaging materials, containers to hold controlled substances, and documents related to the manufacture, harvesting, distribution, sale, or possession of controlled substances.

2. Duffel bags, suitcases, plastic containers, shipping boxes, or other containers used to hold, ship, or transport controlled substances.

3. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities.

4. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, safes, safe deposit box keys and records, storage location keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of drug trafficking activities, or financial transactions related to drug trafficking activities.

5. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

6. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding among and between members and associates involved in drug trafficking activities.

7. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities.

8. Cellular telephones, SmartPhones, pagers, text messaging systems, and other communication devices, including devices capable of sending, receiving, or storing e-mails, and any and all records associated with such communications services.

9. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel.

11.     Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, and keys.

12.     Photographs, videotapes or other depictions of assets, coconspirators, controlled substances, or other activities related to drug trafficking activities.

13.     Any computers or electronic media that were or may have been used as a means to commit the offenses described on the warrant. For any computer hard drive or other electronic media (hereinafter, "MEDIA") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

   a.  evidence of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

   b.  passwords, encryption keys, and other access devices that may be necessary to access the MEDIA; and

   c.  documentation and manuals that may be necessary to access the MEDIA or to conduct a forensic examination of the MEDIA.

14.     Records and things evidencing the use of the Internet to communicate, including routers, modems, and network equipment used to connect computers to the Internet; records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

15.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).